**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**TALLAHASSEE DIVISION**

```
UNITED STATES OF AMERICA,        )
                                 ) Case No.:  4:05cr50-RH
            Plaintiff,           )
                                 ) Tallahassee, Florida
vs.                              ) March 8, 2006
                                 ) 12:47 P.M.
CRAIG ROBERT WIGGEN, JR. and     )
WILLIAM JOSHUA BOYD STETSON,     )
                                 )
            Defendant.           )
_____  )
```

**TRANSCRIPT OF SENTENCING PROCEEDINGS**
**BEFORE THE HONORABLE ROBERT L. HINKLE,**
**CHIEF UNITED STATES DISTRICT JUDGE**

<u>APPEARANCES</u>:

```
For the Plaintiff:          Gregory R. Miller
                            United States Attorney
                            By:  WINIFRED L. ACOSTA NeSMITH
                                 Assistant U.S. Attorney
                            111 North Adams Street
                            Tallahassee, Florida 32301


For the Defendant,          Banks and Morris, P.A.
CRAIG ROBERT WIGGEN, JR.:   By:  ROBERT ALEXANDER MORRIS
                                 Attorney at Law
                            810 Thomasville Road
                            Tallahassee, Florida 32303


For the Defendant:          Randolph P. Murrell
WILLIAM JOSHUA STETSON:     United States Public Defender
                            By:  RANDOLPH P. MURRELL
                                 Attorney at Law
                            227 North Bronough Street
                            Tallahassee, Florida 32301
```

PDF created with pdfFactory trial version www.pdffactory.com

1                    P R O C E E D I N G S

2        (Call to Order of the Court.)

3        (Defendants present.)

4            THE COURT:  Good afternoon.  Please be seated.

5            This is United States versus Craig Robert Wiggen,

6    Jr., and William Joshua Boyd Stetson.  We are here for

7    sentencing.

8            Is the government ready to proceed with sentencing?

9            MS. NeSMITH:  Yes, Your Honor.

10           THE COURT:  Is the defense ready to proceed with

11   sentencing?

12           MR. MORRIS:  Yes, Your Honor.

13           MR. MURRELL:  Yes, sir, we are.

14           THE COURT:  Mr. Wiggen and Mr. Stetson, the procedure

15   we're going to follow this afternoon is this:

16           First, I'm going to address the issues under the

17   United States Sentencing Guidelines and take any testimony

18   that relates either to the guidelines or the question of the

19   sentence that should be imposed within or outside of the

20   guidelines.

21           When that all has been done, each of you will have an

22   opportunity to make any statement that you would like to make.

23   You don't have to say anything, but you are welcome to say

24   anything you'd like to.  And your lawyers will be able to make

25   any presentation they would like to make on your behalf.

1          Before we start all of that, I need to ask each of

2     you this:

3          Have you read your presentence report and the

4     addendum -- in this case, I think there is a supplemental

5     addendum -- and have you discussed those with your lawyer?

6          Mr. Stetson, have you done that?

7          DEFENDANT STETSON:  Yes, Your Honor, I have.

8          THE COURT:  And, Mr. Wiggen, have you?

9          DEFENDANT WIGGEN:  Yes, sir, I have.

10         THE COURT:  All right.  The presentence report for

11    Mr. Wiggen calculates a Total Offense Level of 19 and a

12    Criminal History Category of I.  That would produce a

13    guidelines range of 30 to 37 months in custody.

14         In Mr. Stetson's case, the presentence report

15    calculates a Total Offense Level of 15 and a Criminal History

16    Category of I, which produces a guideline range of 18 to

17    24 months.

18         In each case there is an objection to the calculation

19    of the amount of loss under Guidelines Section 2B1.1(b)(1).

20         In Mr. Stetson's case, there is an objection to the

21    failure of the presentence report to afford him a reduction in

22    the offense level for a minor or minimal role under Section

23    3B1.2.

24         Each defendant has requested a sentence below the

25    guidelines range under Booker; and Mr. Wiggen also has

1    asserted that, even under the guidelines, a departure would be

2    appropriate.

3           I'm not sure if Mr. Stetson has made the same

4    assertion.  I think Mr. Stetson's position is that a lower

5    sentence is warranted under Booker, not under a

6    guidelines-based departure.  Do I have that right?

7           MR. MURRELL:  Well, actually, in my letter to

8    Ms. Wilson I had stated that departure would be appropriate.

9           THE COURT:  All right.  So, there's a departure for

10   Mr. Stetson as well that's been requested.

11          On the amount of loss, the burden is on the

12   government with respect to the minor or minimal reduction.  On

13   the question of a departure, the burden is on the defense.

14          Does either side have evidence to present?

15          MS. NeSMITH:  Yes, Your Honor.

16          THE COURT:  All right.  Please call your first

17   witness.

18          MS. NeSMITH:  The government would call Tammy

19   Thompson.

20          DEPUTY CLERK:  Please raise your right hand.

21          ***TAMRA ANN THOMPSON, GOVERNMENT WITNESS, DULY SWORN***

22          DEPUTY CLERK:  Please be seated.

23          Please, state your full name and spell your last

24   name for the record.

25          THE WITNESS:  Tamra Ann Thompson, T-h-o-m-p-s-o-n.

*Tamra Ann Thompson - Direct*

```
 1                      DIRECT EXAMINATION

 2   BY MS. NeSMITH:

 3   Q.   Good afternoon.  Are you an investigator with the

 4   Tallahassee Police Department?

 5   A.   Yes, ma'am.

 6   Q.   And were you involved in this case?

 7   A.   Yes, ma'am.

 8   Q.   How did you get involved?

 9   A.   I received a report for a follow-up investigation from an

10   investigator with the Financial Crimes Unit, Tallahassee

11   Police Department.

12   Q.   And did one of the victims come in and file a complaint?

13   A.   Yes, ma'am.

14   Q.   And did you follow up on that?

15   A.   Yes, ma'am.

16   Q.   And what was the process for doing that?

17   A.   In 2004, one of the victims, Ms. Marlene Czerniak, was

18   notified by CitiBank about some fraudulent activity on her

19   account.  And she reviewed her account and found that

20   between -- I believe it was November 14th and 17th of 2004,

21   there were seven fraudulent transactions made on her account.

22   She realized that she didn't make the transactions.  She last

23   used the card at Tia's Tex Mex on November 12th and still had

24   possession of her card.

25        So, she then met with officials, loss prevention officers
```

1   at Home Depot, where one of the transactions had been made,

2   and looked at a surveillance video of the transaction and

3   realized that it looked like the waiter she had at Tia's Tex

4   Mex.  So, she filed a police report at our agency at that

5   point, and I received it for follow-up investigation.

6   Q.  And did you obtain the video surveillance?

7   A.  Yes, ma'am.  I collected the video surveillance from Home

8   Depot and Lowe's, two of the locations where two of the

9   transactions had taken place.

10  Q.  And did you actually go to Tia's Tex Mex Restaurant here

11  locally?

12  A.  Yes, ma'am.

13  Q.  And who did you encounter there?

14  A.  I spoke with the manager there and found out that

15  Ms. Czerniak's waiter was Mr. Josh Stetson, William Stetson.

16  Q.  And was he the person in the video?

17  A.  No, ma'am.  I called him in for an interview; and, once I

18  saw him, I realized -- I didn't make contact with him at the

19  restaurant.  In fact, he was no longer working at the

20  restaurant at that point.  I called him in for an interview;

21  and, once I saw him, I realized that he was not the subject

22  making the fraudulent transactions.  So, I had him view the

23  video to see if he might recognize who the subject was, and

24  he looked at the video and said it looked like Rob.

25  Q.  And did you find out that that was Craig Robert Wiggen,

*Tamra Ann Thompson - Direct*

7

1   Jr.?

2   A.   Yes, ma'am.  I asked him how he knew Rob, and he said

3   that he and -- well, Rob is a childhood friend of his

4   brother, and that they all had grown up together in Central

5   Florida.  At that time he couldn't give me Mr. Wiggen's last

6   name, but he told me where I could find him and provided me

7   with a cell number for Mr. Wiggen.

8   Q.   And did you make contact with Mr. Wiggen?

9   A.   Yes, I did.  Myself and Investigator Bird met with

10  Mr. Wiggen -- I believe it was February 28th -- with

11  Mr. Wiggen and his brother at their apartment.

12      Once I saw Mr. Wiggen, I realized that he was the subject

13  that had made the transactions on Ms. Czerniak's account.

14  So, I started to talk to him about that, and he wished to

15  consult an attorney prior to talking to us.  So, I asked him

16  to get with his attorney and then make arrangements to meet

17  with me again.

18  Q.   And did you later meet with him?

19  A.   Yes, ma'am.  I met with him again on March 2nd and

20  March 10th with his attorney, Mr. Ege.

21  Q.   And by this time had you determined whether or not there

22  were additional victims?

23  A.   No, ma'am, not at this time.

24  Q.   Did you later on determine that there were more victims?

25  A.   Yes, ma'am.

1  Q.   And how did you do that?

2  A.   After interviewing Mr. Wiggen -- I can go into what he

3  told me.   That's how I determined that there were additional

4  victims.

5  Q.   Yes.

6  A.   Mr. Wiggen told me that this all started -- at the time

7  it was four or five years ago, which would have been right

8  around the year 2000, when he was approached by a classmate

9  by the name of Robert Bojan, and Mr. Bojan asked him if he

10  could come up with a computer program that would transfer

11  information taken from a skimmer on to an encoder.   And

12  Mr. Wiggen agreed to do this for Mr. Bojan for a thousand

13  dollars, I believe it was.

14     He said initially that he didn't understand or know what

15  he was -- Mr. Bojan had planned to do with this information,

16  but he said he soon realized that he was using the

17  information to make counterfeit credit cards.

18     He said that a couple months after he had made this

19  program for Mr. Bojan, Bojan contacted him and asked him if

20  he would be interested in selling items that were purchased

21  with these counterfeit credit cards on eBay.   He agreed to do

22  that.   And he said Bojan sent him counterfeit credit cards

23  along with matching counterfeit identification, and he sold

24  items on eBay.   I believe it was 15 percent he got to keep,

25  and he also got paid for making the program for Mr. Bojan.

PDF created with pdfFactory trial version www.pdffactory.com

1  Q.  And did Mr. Wiggen say that he later decided to make

2  counterfeit credit cards himself?

3  A.  Prior to that -- if you want me to get into how they came

4  about further down.

5  Q.  (Nods head.)

6  A.  Basically, they discussed other ways to obtain

7  credit-card information, and they talked about a little

8  device called KeyGhost, which could attach on to, I guess, a

9  keyboard with a credit card swipe on it.  And this

10  information -- this KeyGhost would collect information from

11  credit cards.

12      Mr. Wiggen said he purchased one of these items mail

13  order from New Zealand and sent it to Bojan; and with this

14  information, Bojan continued to make counterfeit cards, and

15  Mr. Wiggen continued to use these counterfeit cards to sell

16  items on eBay.

17      He did this up until -- well, he said in 2001 Mr. Bojan

18  was arrested on fraud-related charges.  Got out about 2003.

19  And when he got out in '03, Bojan contacted Mr. Wiggen again,

20  and kind of wanted to start up business again.  And by this

21  time, Mr. Wiggen had found that there was, I guess, a better

22  item on the market, which was a KeyKatcher, that essentially

23  did the same thing, except it was easier to place on

24  computers.

25      Mr. Bojan asked Mr. Wiggen if he thought that he could

PDF created with pdfFactory trial version www.pdffactory.com

*Tamra Ann Thompson - Direct*

1    place one of these items or a few of these items here in

2    Tallahassee.  He agrees to do that.

3    Q.  Where would he place them?

4    A.  He placed them at Applebee's, a couple of computers

5    there.  He would place the items, leave them there for a few

6    days, place the KeyKatchers.  Then he would go back and

7    collect the KeyKatchers and mail them to Bojan.  Bojan had

8    them password-protected, and then with that information Bojan

9    would continue to send him counterfeit credit cards.

10       He said he did this for a couple of months, until

11   Applebee's rearranged their registers where he no longer had

12   access to the registers.  He believes that Bojan was again

13   arrested and things just kind of slowed down between he and

14   Bojan.  So, that's when he decided to purchase his own

15   KeyKatcher.

16   Q.  And, again, the KeyKatcher is a just an electronic device

17   which stores credit-card information?

18   A.  Yes, ma'am.

19   Q.  Did he tell you how he planned to use the KeyKatcher

20   himself?

21   A.  Yes.  He researched a location.  He said he checked up

22   Monroe Street, Tennessee Street, different areas in

23   Tallahassee and found that a suitable location would be the

24   Roadhouse Grill on North Monroe Street.  He said he put the

25   KeyKatcher at the register, one of the back registers by the

PDF created with pdfFactory trial version www.pdffactory.com

1  restrooms.  He left it there for about six days.  He went

2  back to check on it, and it was gone.

3  Q.  Did you later find out what happened to that KeyKatcher?

4  A.  Yes.  A service personnel working on the computers found

5  it and sent it to Orlando.  We later collected it and sent it

6  off to Secret Service.

7  Q.  Did he tell you -- did he tell you about his relationship

8  with Mr. Stetson?

9  A.  Yes.  After his KeyKatcher was collected or lost, he

10 decided that he was going to try a skimmer, but he had to

11 find somebody that would be willing to -- that had access to

12 credit cards that would be willing to collect information on

13 a skimmer.  And he said that he thought of Mr. Stetson

14 because he knew that Mr. Stetson was in desperate need of

15 money and was on the verge of being evicted from where he was

16 living.  So, he approached Mr. Stetson and asked him if he

17 would be willing to do that, use the skimmer and collect

18 credit-card information for him, and Mr. Stetson agreed.

19 Q.  And how did that work?

20 A.  Mr. Wiggen provided Mr. Stetson with the skimmer.

21 Mr. Stetson then would collect credit cards from patrons at

22 Tia's.  He said that he would go back to the register or to

23 make the transaction with the credit card, and he would just,

24 you know, run the credit card through the skimmer.

25 Q.  Where did he place the skimmer, Mr. Stetson?

*Tamra Ann Thompson - Direct*

1    A.   He kept it in his waiter's pouch.

2    Q.   Do you know how large the skimmer is?

3    A.   It's about like this.   It's kind of small.   Two inches.

4    Q.   So, a small electronic device, again, which collects

5    credit-card information?

6    A.   Right.

7    Q.   And once the information was collected on the skimmer

8    that Mr. Stetson carried, what would he then do with the

9    information?

10   A.   Mr. Wiggen said that he would take the information from

11   the skimmer, and he would use his encoder that he purchased

12   as well to encode blank gift cards that he picked up from

13   various locations.

14   Q.   And would he then use the cards?

15   A.   Yes, ma'am, he would then use the cards.   He estimated

16   that Stetson provided him with approximately 16 --

17   credit-card information on approximately 16 cards.   He said

18   he used ten of the -- made ten cards from that information

19   gathered.

20       He would go around -- he actually bought personal

21   stuff -- clothes, food -- and he also bought items that he

22   could sell on eBay.   He said he purchased enough items to

23   sell on eBay to pay for the skimmer and the encoder.   He

24   basically said he used cards until they just wouldn't work

25   anymore.   He estimated using the cards, put about a thousand

PDF created with pdfFactory trial version www.pdffactory.com

*Tamra Ann Thompson - Direct*

13

1   dollars, he estimated, until the cards wouldn't work anymore.

2   Q.  Did he say that he had learned how to use the cards from

3   his dealings with Mr. Bojan?

4   A.  He said Mr. Bojan gave him some tips on how to make the

5   cards last longer.  Mr. Bojan told him not to spend more than

6   $500 a day on a card or more than $200 per purchase on a

7   card.

8   Q.  Did you also interview Mr. Stetson?

9   A.  Yes, ma'am.

10  Q.  And was that on or about March 15th of 2005?

11  A.  Yes, ma'am.

12  Q.  And was the information confirmed -- was the information

13  that was given by Wiggen that Stetson was involved, was that

14  confirmed?

15  A.  Yes, ma'am.  Mr. Stetson said that Craig had asked him to

16  use the skimmer several times to the point that he was

17  bugging him about it.  And Mr. Stetson said that he really

18  needed the money to pay the bills.  So, he told Mr. Wiggen

19  that he would collect or use the skimmer to collect

20  credit-card information.

21  Q.  Were any computers seized as part of the investigation?

22  A.  Yes, ma'am.

23  Q.  And from whom?

24  A.  From Mr. Wiggen.

25  Q.  How many?

PDF created with pdfFactory trial version www.pdffactory.com

*Tamra Ann Thompson - Direct*

1    A.   One.

2    Q.   And was any information found in the computer?

3    A.   Yes, ma'am.  He had information -- credit-card

4    information on seven different victims that were stored,

5    encrypted on his computer.

6         MS. NeSMITH:  Your Honor, may I approach the witness?

7         THE COURT:  You may.

8    BY MS. NeSMITH:

9    Q.   I'm showing you Government's Exhibit A.  Would you take a

10   look at that?  Is that a printout of what was on the

11   computer?

12   A.   Minus the black marking, yes.

13   Q.   And is the black marking, does that show where the

14   customers' information has been redacted, the actual

15   credit-card numbers?

16   A.   Yes.

17        MS. NeSMITH:  For the record this is Government's

18   Exhibit A, the government would move it into evidence.

19        THE COURT:  Government A is admitted.

20        (**GOVERNMENT EXHIBIT A:**  Received in evidence.)

21        MS. NeSMITH:  And also at this time the government

22   would move into evidence Government's Exhibit B, which is a

23   transcript that has also been provided to the defense.

24        MR. MURRELL:  We've stipulated to that; and, in fact,

25   some of that was what I had intended to introduce, and so we

*Tamra Ann Thompson - Direct*

```
 1    are in agreement and we have no objection.

 2            THE COURT:  All right.  Government's Exhibit B is

 3    also admitted.

 4        (GOVERNMENT EXHIBIT B:  Received in evidence.)

 5    BY MS. NeSMITH:

 6    Q.  I see on Government's Exhibit Number A, there are names

 7    listed.  Are those names of victims that you found in this

 8    case?

 9    A.  Yes, ma'am.

10    Q.  Did you ask Mr. Wiggen about any of this information?

11    A.  Yes, ma'am.  I asked him about the comments at the end.

12    Q.  And what did he say?

13    A.  He had researched some of these victims through property

14    records and was able to, I guess, determine what if -- that

15    he thought they had money or didn't have money based on what

16    he found in his research.

17    Q.  Did he tell you why he conducted the research?

18    A.  He was just trying to find out approximately how much the

19    cards would have on them, how much he would be able to use

20    the cards.

21    Q.  So, did he base that on whether or not he thought the

22    victim was wealthy?

23    A.  Yes.  And he also made some comments about the numbers,

24    the amount of numbers on the card.  If it was a smaller

25    number, he thought that the cardholder had been -- if the
```

1   person had been a cardholder for a longer period of time,

2   they might have more credit.

3   Q.   Now, during Mr. Stetson's interview on March 15th of

4   2005, did he tell you that Mr. Wiggen sold Mr. Bojan only

5   higher-end cards, the platinum cards?

6   A.   Yes, ma'am.

7   Q.   And is that the same thing that Mr. Wiggen told you?

8   A.   Mr. Wiggen told me that he had asked Mr. Stetson to try

9   to stay with cards in males' names and stay away from

10  American Express cards, and to use the higher-end cards.

11  Q.   And did Mr. Wiggen tell you how long he would use the

12  card?

13  A.   He said he would use it until it wouldn't work anymore.

14  Q.   Let me call your attention specifically to March 2nd of

15  2005, of the transcript of Wiggen's interview.  Could you

16  read what it says that Wiggen said when you asked him --

17  about the middle of the page there?

18  A.   Where it starts with, "Well, I mean, I used the same

19  pattern"?

20  Q.   Yes.

21  A.   "Well, I mean, I used the same pattern with all of them.

22  You would just take a card, put a couple hundred bucks a day

23  on it until it's dead.  So, you would usually use them all or

24  at least every other day."

25  Q.   And, actually, I believe it says that Investigator Bird

*Tamra Ann Thompson - Direct*

1    asked him those questions.

2        Was Investigator Bird present during the interview?

3    A.  Yes, ma'am.

4    Q.  And you were also present?

5    A.  Yes, ma'am.

6    Q.  Now, at one point Mr. Wiggen indicated to you that he had

7    destroyed the encoder.  Do you recall that?

8    A.  Yes, ma'am.

9    Q.  And what did he say?

10   A.  He said that he threw the encoder in a dumpster.

11   Q.  And did he tell you why?

12   A.  He said that he had got caught up on his bills and didn't

13   really trust anyone else to use the skimmer.  So, he made two

14   last cards and went ahead and threw the encoder away and

15   planned to sell the skimmer.

16   Q.  And when you were asking him about information on his

17   computer and the encoder came up, at that point he explained

18   to you that he had destroyed the encoder and he had plans to

19   sell the skimmer.  Do you recall that?

20   A.  Yes, ma'am.

21   Q.  Now, he indicated in the transcript, it says, "Once I

22   found out that I was being investigated --" presumably for

23   this "-- I also destroyed that card."  What card is he

24   referring to?

25   A.  He said that he had made -- there were actually -- he

*Tamra Ann Thompson - Direct*

```
 1   ended up saying that he had made two cards just to have after

 2   he decided to get rid of this encoder and stuff.  And once he

 3   found out that the police were asking questions, he got rid

 4   of those two cards.

 5   Q.  So, the two cards were not destroyed until he was aware

 6   of the investigation?

 7   A.  That's what he said, yes.

 8   Q.  Can you look at this page 6 of the transcript?  I believe

 9   you had just finished discussing the dentist account, the one

10   that he had researched.

11   A.  Yes, ma'am.

12   Q.  Now, it says that he said, "That one was, I was going to

13   save that for a few months just because of -- it was

14   potentially very high."  What is he referring to?

15   A.  He -- it was the Hubbard card; and he, through his

16   research, found out that Mr. Hubbard was a dentist, and I

17   guess he figured that a dentist would have a lot of money.

18   Q.  Was it your understanding that he was intending to hold

19   on to that specific card?

20   A.  Yes, ma'am.  He said that he thought about using that

21   card to purchase a plasma TV or something big.

22   Q.  Starting from the bottom of the page, page 9 of the

23   transcript, the second entry where Wiggen is speaking, is

24   that what you were referring to about the plasma television?

25   A.  Yes, ma'am.
```

PDF created with pdfFactory trial version www.pdffactory.com

*Tamra Ann Thompson - Direct*

1    Q.   And could you read that into the record, please?

2    A.   "Yeah, I was planning on doing something stupid, like try

3    to get a plasma TV or something."

4    Q.   And before that the question posed was, "So you decided

5    you're going to try to make one and try to get this dentist's

6    card.  It had a lot of money."

7    A.   That's the question I asked prior to that answer.

8    Q.   And that particular person was determined to be

9    Mr. Hubbard?

10   A.   Yes, ma'am.

11   Q.   And looking back at Government's Exhibit A, do you see

12   Mr. Hubbard's name listed?

13   A.   Yes, ma'am.

14   Q.   Based on your interview of Mr. Stetson and Mr. Wiggen, at

15   what point did Mr. Wiggen decide to completely stop using the

16   cards, the fraudulently-obtained cards?

17   A.   It was my understanding that he decided to stop using

18   them, he said, after he had gotten enough money to get caught

19   up on his bills, buy some clothes, buy some alcohol, and pay

20   for his encoder and the skimmer.  And, like I said, he said

21   he was going to hang on to two cards to use just to have for

22   future use, and then he got rid of the rest of the -- he said

23   he got rid of his encoder at that point and was going to sell

24   the skimmer, but had not sold it yet.

25   Q.   And by that time you had approached him, so he was aware

PDF created with pdfFactory trial version www.pdffactory.com

*Tamra Ann Thompson - Direct*

1    of the investigation?

2    A.   I'm not exactly sure when.  I'm only going on what he

3    told me when he got rid of the stuff.  I know he still had

4    the skimmer in his possession, and he said that he got rid of

5    the last two cards after he became aware of the

6    investigation.

7    Q.   So, he still had the skimmer?

8    A.   Correct.

9    Q.   Okay.  Which was part of the equipment that he used in

10   order to obtain the fraudulently-obtained information?

11   A.   Yes, ma'am.

12   Q.   Okay.  And he still had two fraudulently-made cards with

13   victim information?

14   A.   I never saw the cards.

15   Q.   Based on what he's telling you?

16   A.   He said he got rid of them after the investigation

17   started.

18   Q.   Okay.

19            MS. NeSMITH:  May I have a moment?

20            THE COURT:  You may.

21            MS. NeSMITH:  No further questions at this time.

22            THE COURT:  Cross-examine?

23            MR. MORRIS:  Thank you, Judge.

24                          CROSS-EXAMINATION

25   BY MR. MORRIS:

*Tamra Ann Thompson - Cross/Morris*

1    Q.   Good afternoon, Investigator Thompson.

2    A.   Good afternoon.

3    Q.   Two brief areas of focus.  The first is just for

4    clarification.

5         Your understanding was that Mr. Wiggen had destroyed all

6    but two of the cards prior to your investigation?

7    A.   Yes, sir.

8    Q.   Okay.  And is it also your understanding that those cards

9    or that data were no longer usable to Mr. Wiggen?

10   A.   Can you repeat that?

11   Q.   Sure.  The cards that Mr. Wiggen advised you that he

12   destroyed prior to the initiation of your investigation --

13   A.   Right.

14   Q.   -- was it also your understanding that the data and/or

15   the cards associated were no longer usable to Mr. Wiggen?

16   A.   The data probably could have been used still.  I mean, he

17   still had the information on his computer at that point.  He

18   still had information on -- the victim's credit information

19   at that point.

20   Q.   Okay.  Do you remember with any specificity which data

21   was retained on the computer that he could have further used?

22   A.   The data on the exhibit.

23   Q.   The same exhibit that Ms. Acosta NeSmith showed you?

24   A.   Yes.

25   Q.   But the actual physical cards or magnetic strips, or

PDF created with pdfFactory trial version www.pdffactory.com

*Tamra Ann Thompson - Cross/Morris*

 1   things of that nature, had been destroyed because, using your

 2   words, because he had caught up on his bills and things of

 3   that nature?

 4   A.  That's what he said.

 5   Q.  Okay.  However, during the course of your investigation

 6   and answering your questions, he did wind up admitting that

 7   he retained two of them -- one of which belonging to the

 8   dentist and another one to another individual -- but

 9   destroyed those two once he realized that he may be subject

10   to an investigation?

11   A.  Yes, sir; that's what he said.

12   Q.  With respect to the second issue that I would like to

13   inquire about, with respect to the credit limits or the

14   research that was done, did you wind up delving into why it

15   might be important that the individual have a higher credit

16   limit versus a person with a lower credit limit?

17   A.  Did I speak with Mr. Wiggen about that?

18   Q.  Correct.

19   A.  I don't recall all of the conversation.  We did discuss

20   the fact that he was researching the names provided to him by

21   Mr. Stetson.

22   Q.  Am I fair in assuming that there was not a discussion or

23   inquiry with Mr. Wiggen as to credit card that had a higher

24   credit limit when charges were made that it wouldn't draw so

25   much attention to the charges as compared to someone with a

PDF created with pdfFactory trial version www.pdffactory.com

*Tamra Ann Thompson - Cross/Morris*

1  lower credit line?

2  A.  I don't remember specific conversation dealing a lot with

3  the -- how much.  I remember that he did mention that he

4  looked at the amount of numbers that was assigned to the

5  credit card, and he thought that you could determine possibly

6  by the date or information numbers on the card how long the

7  person had been a member or had that card, and thought that

8  they might have a higher credit limit, along with his

9  research in the property records.

10 Q.  In this transcript that Ms. Acosta NeSmith showed you,

11 there was some discussion about the process a couple of

12 hundred bucks every other day and so forth.

13     In that discussion, in your inquiries, was it ever

14 discussed any thresholds that Mr. Wiggen would attempt not to

15 exceed?

16 A.  He said he was initially told by Mr. Bojan how to make

17 the card last the longest, would be to not put more than $500

18 a day or spend more than 200 on one purchase.

19 Q.  In furtherance of that inquiry, did you wind up delving

20 into what Mr. Wiggen's practices were with more specificity?

21 A.  He said that he would use the card, approximately a

22 hundred or $200 a transaction every other day; and he said he

23 used the card until it just wouldn't work anymore.

24 Q.  Okay.  In that transcript, where it made the notation of

25 his comment, I think he used the "until it dropped dead" or

PDF created with pdfFactory trial version www.pdffactory.com

1    something along those lines?

2    A.   Right.

3    Q.   Did the reference in terms of "dropping dead," is that a

4    reference to the card being cancelled or unusable?  Or what

5    is that a reference to?

6    A.   To that, him not being able to put any more charges on

7    the card.

8    Q.   Okay.  In that regard, was there any inquiry or

9    discussion with Mr. Wiggen as to when in his own mind or

10   through his own practices in this scheme, when he would

11   determine that there should not be any more charges put on

12   the card?

13   A.   I believe he said that he was able to use the cards

14   approximately five days.

15   Q.   Okay.

16          MR. MORRIS:  Thank you, Investigator Thompson.

17          Tender the witness, Your Honor.

18          THE COURT:  Mr. Murrell?

19          MR. MURRELL:  Thank you.

20                      CROSS-EXAMINATION

21   BY MR. MURRELL:

22   Q.   Investigator Thompson, I'm the third one to ask you about

23   this, so there's probably not a lot I need to ask, but I did

24   want to clear up one thing.

25       Mr. Wiggen's method here was to take this information, be

PDF created with pdfFactory trial version www.pdffactory.com

*Tamra Ann Thompson - Cross/Murrell*

1    it from a skimmer or from this other device, and then encode

2    it on some kind of gift card, or I guess Mr. Bojan may have

3    created some fake credit cards, but was that the method?

4    A.   Yes, sir.

5    Q.   Okay.  These were not fellows that were just taking

6    credit-card numbers and using the numbers to make purchases

7    over the phone or over the internet?

8    A.   Correct.  They were making counterfeit cards.

9    Q.   So, when Mr. Wiggen destroyed his encoder, he would not

10   have been able to transfer this information to a gift card?

11   A.   When and if, no, sir.

12   Q.   Well, he told you that he destroyed it.

13   A.   Yes, sir.

14   Q.   And you never did recover an encoder.

15   A.   That's true.

16   Q.   On the other hand, you did -- he said he still had the

17   skimmer.

18   A.   Yes, sir.

19   Q.   And he turned the skimmer over to you.

20   A.   Yes, sir, he did.

21   Q.   And he said he destroyed this encoder before he ever

22   found out about your investigation.

23   A.   Yes, sir, he did.

24   Q.   And, in fact, what he told you was, he had really quit

25   the whole process except for these last two cards.

*Tamra Ann Thompson - Cross/Murrell*

1  A.  Yes, sir; that's what he told me.

2  Q.  He had got rid of the encoder.  He threw it way.  Is that

3  what he said?

4  A.  Yes, sir.

5  Q.  He destroyed the other cards.

6  A.  Well, he used them until he couldn't use them.

7  Q.  Right.  But they apparently weren't around anymore.

8  A.  Correct.

9  Q.  So, all he had left was just two cards.

10  A.  And credit-card information on the computer.

11  Q.  Right.  But, again, if he was -- what he had done in the

12  past is, he had transferred this information using this

13  encoder to a gift card.

14  A.  Yes, sir.

15  Q.  Okay.  And he no longer had the encoder, at least if what

16  he said was true.

17  A.  Yes, sir.

18  Q.  And you did not find any encoder.

19  A.  No, sir, I did not.

20  Q.  And what he told you, too, was that he really had quit.

21  I mean, that was one of the questions you asked him, wasn't

22  it?

23  A.  Yes, sir.

24  Q.  And that's what he said.  "Yes, I quit expect for these

25  last two cards."

1   A.   Yes.

2   Q.   And he was going to use the dentist's card to do, as he

3   said, something stupid to, like, buy a plasma TV.

4   A.   Yes, sir; that's what he said.

5           MR. MURRELL:   That's all of the questions I have.

6           THE COURT:   Redirect?

7                        REDIRECT EXAMINATION

8   BY MS. NeSMITH:

9   Q.   Investigator Thompson, since there was still information

10  on the computer that Wiggen had, is it possible that he still

11  could have used that information to make purchases?

12  A.   Yes, ma'am.

13  Q.   Could he have made internet purchases?

14  A.   Yes, ma'am.

15          MS. NeSMITH:   I have nothing further.

16          THE COURT:   Other than what Mr. Wiggen told you, do

17  you have any information showing whether he had or had not

18  gotten rid of the cards?

19          THE WITNESS:   No, sir.

20          THE COURT:   So, the only reason you have to believe

21  that he had voluntarily quit any part of this is because

22  that's what he told you?

23          THE WITNESS:   Yes, sir.

24          THE COURT:   Either side have questions to follow up

25  on mine?

1          MR. MORRIS:  No, sir.

2          MR. MURRELL:  No, sir.

3          THE COURT:  Thank you, Ms. Thompson.  You may step

4     down.

5          Ms. NeSmith, further evidence for the government?

6          MS. NeSMITH:  No, Your Honor.

7          THE COURT:  Defense case?  Mr. Morris?

8          MR. MORRIS:  Thank you, Judge.  Judge, Craig Robert

9     Wiggen.

10          THE COURT:  All right.  Mr. Wiggen, right up here, if

11     you would, please.

12          DEPUTY CLERK:  Please raise your right hand.

13          **CRAIG ROBERT WIGGEN, JR., THE DEFENDANT, DULY SWORN**

14          DEPUTY CLERK:  Be seated.

15          THE COURT:  Please, state your full name and spell

16     your last name for the record.

17          THE WITNESS:  Craig Robert Wiggen, Jr.; W-i-g-g-e-n.

18                         DIRECT EXAMINATION

19     BY MR. MORRIS:

20     Q.  Mr. Wiggen, I first want to start with, if you can

21     provide the court with a description of the hardware

22     components that were required with this.  We've heard skimmer

23     and Ghost Key and KeyKatcher.  If you can kindly give us a

24     layperson's view of what components were required in this.

25     A.  I guess the "skimmer" is the term that the police have

*Craig Robert Wiggen - Direct*

1    used.  I referred to it as a "reader."

2    Q.  As a what?

3    A.  A "reader."

4    Q.  Okay.

5    A.  It's just a device about this big with a card-swiping

6    strip and an on/off button.  It has a little connection to

7    where it can be connected to a personal computer.

8    Q.  And what is the reader -- what did you wind up using it

9    for in this instance?

10   A.  To store the information on magnetic cards.

11   Q.  Okay.  So, you physically swipe a card through it; it

12   reads the data that's on the magnetic strip, and then it

13   stores it internally within the device?

14   A.  Yes.

15   Q.  Once you store that data in the device, what do you do

16   with it from there?

17   A.  Download it to a computer.

18   Q.  Okay.  Once downloaded to a computer, what winds up

19   happening with the data once it's been downloaded?

20   A.  It's downloaded into an encoder, so it could be encoded

21   on to another magnetic card.

22   Q.  Okay.  And if you can, describe for all of us what an

23   encoder is.

24   A.  It looks very similar, except it's much larger.  It hooks

25   up to a computer.  It's probably about this big.

*Craig Robert Wiggen - Direct*

1  Q.  So the data winds up being transferred from a hard drive

2  to that encoder, and the encoder does what with the data?

3  A.  It encodes the data on to a magnetic card.

4  Q.  Okay.  And so is there a process where the card is

5  actually swiped?

6  A.  Yes, the card is swiped.

7  Q.  Okay.  So, it gets swiped through the encoder, and that's

8  what winds up delivering the transfer of the data?

9  A.  Yes.

10  Q.  And that was the process or the procedure used in the

11  issues that are before the court, correct?

12  A.  Yes.

13  Q.  Now, specifically, you've heard Investigator Thompson's

14  testimony, and obviously you're aware of the conduct

15  involved.  If you can, describe for the court -- there were

16  roughly six or seven cards that you wound up advising

17  Investigator Thompson that you had destroyed, correct?

18  A.  Yes.

19  Q.  Do you have any recollection when you wound up destroying

20  them in relation to when you found out that you were subject

21  to an investigation?

22  A.  I had destroyed all of those cards before I was -- before

23  I suspected that I was subject to investigation.

24  Q.  Okay.

25  A.  Not all of the cards were physically destroyed.  Most of

PDF created with pdfFactory trial version www.pdffactory.com

1  them were just -- data was re-encoded on the top.

2  Q.  Okay.  The cards -- in other words, the card that you

3  downloaded the data to, it was destroyed for the purposes of

4  further use of that card, because other data had been placed

5  on to it?

6  A.  Yes.

7  Q.  And the encoder, you wound up throwing it in the trash, I

8  guess?

9  A.  Yes.

10  Q.  And when did that wind up happening?

11  A.  Sometime -- I guess it would have been in early December.

12  Q.  Okay.

13  A.  Of 2004.

14  Q.  Would that have been before or after, based on your

15  recollection, learning that you were subject to the

16  investigation?

17  A.  That was before.

18  Q.  During your interview with Investigator Thompson, though,

19  you volunteered and advised that you had retained certain

20  cards, correct?

21  A.  Yes.

22  Q.  Okay.  And the cards that you retained -- I believe that

23  there was testimony, one belonging to a dentist, another

24  belonging to another individual -- were there actual physical

25  cards with the data re-encoded or placed on the card?

PDF created with pdfFactory trial version www.pdffactory.com

*Craig Robert Wiggen - Direct*

1  A.  Yes.

2  Q.  Am I correct in saying, Mr. Wiggen, in order to use the

3  data that was stored in the hard drive, it would have been

4  necessary to use an encoder in order to place that data on to

5  a credit card?

6  A.  Yes, sir.  There was nothing --

7  Q.  I hate to state the obvious, but a little of this is lost

8  on me, and I want to make certain that I understand the

9  process.

10    So, you wound up retaining two of the cards after the

11  destruction of the other cards and the encoder?

12  A.  That is correct.

13  Q.  Did you wind up destroying the other two cards at any

14  point in time?

15  A.  Immediately, once I found out -- once I suspected that I

16  might be under investigation.

17  Q.  And how did you wind up destroying them?

18  A.  Threw them in the trash.

19  Q.  In your view was it possible to utilize the data from the

20  initial six or seven cards that were destroyed?  Was it

21  possible to use that data again in the future?

22  A.  No.

23  Q.  It would have been or potentially could have been

24  possible for you to have used the data, though, on the two

25  cards retained?

*Craig Robert Wiggen - Direct*

1   A.   Yes.

2   Q.   Now, Mr. Wiggen, you wound up asking Mr. Stetson to

3   participate in this, correct?

4   A.   Correct.

5   Q.   And in doing so, there's been some mention of obtaining

6   platinum cards or gold cards and not American Express cards.

7   Can you explain to the court why you would have instructed

8   Mr. Stetson to only get platinum cards or gold cards?

9   A.   I didn't want him to obtain any type of card that would

10   commonly use a PIN number.

11   Q.   And explain that, if you don't mind.

12   A.   If it's a debit card, or any other type of card that

13   requires a PIN number, oftentimes when it was used at

14   terminals, it would ask for the PIN, and that was information

15   I didn't have.  So, I did not want those type of cards.

16   Q.   Okay.  And is it correct that you seeking out platinum or

17   gold cards was in avoidance of the PIN-number issue?

18   A.   Yes.

19   Q.   Is there any correlation with the platinum or gold cards

20   with the credit limit of the credit cards?

21   A.   No.  I was told from Mr. Bojan that the higher-end cards

22   are just as likely to have a high limit just like the regular

23   cards.

24   Q.   If you could, Mr. Wiggen, please expand or elaborate on

25   your usage of the card; and what I mean by that is, how

*Craig Robert Wiggen - Direct*

1  frequently would you use the card or what was the common

2  scheme that was involved in this.

3  A.   Like I said before, just the initial purchase of 2- to

4  $300, and then two purchases a day of 1- or $200 for about

5  five days.

6  Q.   So, 2- to $300 per day for roughly a five-day period?

7  A.   Yes.

8  Q.   In your mind, during the usage of the card, were there

9  particular items that you tried to purchase?

10  A.   Just the items that were easiest to obtain, that would be

11  the least suspicious.

12  Q.   What did you view as being least suspicious?

13  A.   Groceries, clothes, house goods.  That was really about

14  it.

15  Q.   I assume you were trying to avoid credit-card companies

16  from throwing up a red flag and saying, "This purchase looks

17  suspicious."

18  A.   Yes.  I tried to avoid electronics.  Those type of items.

19  Q.   Tried to avoid those?

20  A.   Yes.

21  Q.   Mr. Wiggen, was there a particular dollar amount that you

22  tried not to exceed in total with respect to charges on a

23  particular card?

24  A.   Well, I never actually ever expected to charge more than

25  about $1,500 a card; but, if the card did start to reach the

1   total I estimated about $3,000, it was not used again.

2   Q.  So, you would quit using it once you reached a threshold

3   of approximately $3,000?

4   A.  Yes.

5   Q.  Now, some of the charges on the credit cards exceed

6   $3,000.  If you had a limitation in your own mind of it being

7   $3,000, why would it exceed that dollar amount?

8   A.  Well, I never actually kept any records, just kind of a

9   running total in my head.  I'm sure it's hard to remember all

10  of the transactions and the exact amounts.

11  Q.  Okay.  So, there was -- you kept a running tally in your

12  head then, with the expectation that you would try not to

13  exceed that dollar amount?

14  A.  Yes.

15  Q.  Okay.  And you articulated a moment ago, I think that I

16  heard, that you never anticipated or planned to exceed $1500,

17  but you are aware that it did.

18  A.  Yes.

19          MR. MORRIS:  Tender the witness, Your Honor.

20          THE COURT:  Mr. Murrell?

21          MR. MURRELL:  Thank you, Judge.

22                      CROSS-EXAMINATION

23  BY MR. MURRELL:

24  Q.  Mr. Wiggen, just a couple of questions.

25      You collected the skimmer at some point from Mr. Stetson?

PDF created with pdfFactory trial version www.pdffactory.com

1   A.   Yes.

2   Q.   When was that roughly?

3   A.   Usually after a couple of pieces of data went on it.

4   Q.   But at some point you picked it up for good, and that was

5   with the understanding it wasn't going to be used anymore.

6   When was that?

7   A.   I do not remember.  I do remember collecting it and

8   telling him that I was never going to use it again.  It must

9   have been in November.

10   Q.   Pardon?

11   A.   I must have been in November of 2004.

12   Q.   You've been asked this a couple of times, but let me put

13   the question this way:

14       The day before you found out about the investigation,

15   what were your intentions with regard to those two cards you

16   still had?

17   A.   Those were the last two cards.

18   Q.   The last two cards, right.

19   A.   I'm sorry.

20   Q.   When was the card that belonged to the dentist -- you

21   said something on the tape about doing something stupid like

22   buying a plasma TV.  Did that thought cross your mind?

23   A.   It did. (Laughter.)

24   Q.   And then there was one other card.  What did you intend

25   to do with that card?

PDF created with pdfFactory trial version www.pdffactory.com

*Craig Robert Wiggen - Cross/NeSmith*

1  A.  I believe I actually saved that card, because it was not

2  an American Express, and I planned to buy like a digital

3  camera or something like that.

4  Q.  Did you intend to use it as you did the other cards?

5  Would that be accurate?

6  A.  Similar.

7  Q.  That information that you had that was still in your

8  computer, did you have any intention to use that information?

9  A.  No.  Honestly, I suspected it was an encrypted file.

10  Q.  I'm sorry.  Would you repeat that?

11  A.  I thought that information was deleted.  It was an

12  encrypted file, and I did not have access to it in a while.

13        MR. MORRIS:  Thank you.  That's all I have.

14        THE COURT:  Ms. NeSmith?

15                    CROSS-EXAMINATION

16  BY MS. NeSMITH:

17  Q.  Mr. Wiggen, you do remember telling the investigators

18  that you used the cards until they were dead, right?

19  A.  I believe I did say that.

20  Q.  And by "dead," you meant that you could no longer use

21  them anymore, correct?

22  A.  Correct.

23  Q.  And that would be because you either reached the limit or

24  the cards were deactivated by the credit-card company, right?

25  A.  That's correct.

PDF created with pdfFactory trial version www.pdffactory.com

*Craig Robert Wiggen - Cross/NeSmith*

1  Q.  Now, the cards that you destroyed or re-encoded, was that

2  because they stopped working?

3  A.  I believe most of them, yes.

4  Q.  So, most of those cards that stopped working was because

5  you had already used them, correct?

6  A.  Correct.

7  Q.  Okay.  And you had either used them -- you had used them

8  to the point that they were dead, basically?

9  A.  Yes.  I believe that there were some cards that were --

10  that I did stop using them.

11  Q.  So, again, your intent was to use the cards until you

12  couldn't use them any longer, right?

13  A.  Yes.  I believe there was one or two that lasted so long

14  that I just stopped using them.

15         THE COURT:  We need to take a recess, if we can.  I'm

16  told there was a verdict in the other case, so -- I don't

17  necessarily need you to move all of your stuff.  If you would

18  kind of push it out of the way a little bit, that would be

19  fine.

20         And, Mr. Murrell, I don't think there is anybody on

21  your table at all.  If you straighten that up, that would be

22  fine.  And, Ms. NeSmith, you are involved in the other case,

23  so --

24         MR. MORRIS:  May he step down, Judge?

25         THE COURT:  Yes, please.  Thank you, Mr. Wiggen.

Craig Robert Wiggen - Cross/NeSmith

```
 1        (A recess was taken at 1:47 p.m.)

 2        (The proceedings resumed at 2:02 p.m.)

 3        (Defendants present.)

 4          THE COURT:  This is the resumption of the hearing in

 5   United States versus Stetson and Wiggen.  We took a break for

 6   the return of a verdict in an unrelated case.  We are now back

 7   in this case.

 8          Mr. Wiggen, you are still under oath.

 9          Ms. NeSmith, you may proceed.

10   BY MS. NeSMITH:

11   Q.  Mr. Wiggen, you do admit to researching the victims, do

12   you not?

13   A.  Yes.

14   Q.  And as part of the research that you conducted, you

15   checked property records, right?

16   A.  Yes.

17   Q.  In fact, isn't it true that you actually went by the home

18   or office of the dentist, Mr. Hubbard?

19   A.  I did for that one, yes.

20   Q.  You did?

21   A.  Uh-huh.

22   Q.  And you admit that you purchased the encoder on your own,

23   did you not?

24   A.  Yes.

25   Q.  So, you know how to purchase an encoder; you know how to
```

PDF created with pdfFactory trial version www.pdffactory.com

*Craig Robert Wiggen - Cross/NeSmith*

 1  find one, right?

 2  A.  It's no different than purchasing anything else.

 3          THE COURT:  Mr. Wiggen, it may be a little easier

 4  if -- the chair moves.  You may be able to get a little closer

 5  to the microphone.  It will help us.  Thank you.

 6  BY MS. NeSMITH:

 7  Q.  And, Mr. Wiggen, at the time that you met with the

 8  investigators, you still had some of the information on your

 9  computer, the information that's in Government's Exhibit

10  Number A, which is the printout of about six or seven

11  victims' information.  Are you familiar with that?

12  A.  Yes.

13  Q.  And that was on your computer, right?

14  A.  Yes.

15  Q.  And that was on your computer at the time that you met

16  with the investigators, right?

17  A.  Correct.

18  Q.  That information included credit-card information, right?

19  A.  Correct.

20  Q.  And isn't it true that you could still use that

21  information after you destroyed the encoder?

22  A.  No.

23  Q.  You could go out and purchase another encoder, could you

24  not?

25  A.  I could.

PDF created with pdfFactory trial version www.pdffactory.com

*Craig Robert Wiggen - Cross/NeSmith*

1  Q.  And with the new encoder, you could re-encode this

2  information on to additional gift cards, right?

3  A.  It would have been possible.

4  Q.  I'm sorry?

5  A.  That would have been possible.

6  Q.  That would have been possible.  Okay.

7      And then you could have used those gift cards just as you

8  had used the other gift cards, right?

9  A.  Yes.

10  Q.  To make purchases like the purchases that you had made

11  before you sold the items on eBay?

12  A.  Yes.

13  Q.  And the last two cards that you had, I believe one would

14  have been the card belonging to Mr. Hubbard.  Do you recall

15  those two last cards?

16  A.  I do.

17  Q.  You did intend to use those cards, did you not?

18  A.  Yes.

19  Q.  And you were going to use those cards to make purchases

20  for yourself?

21  A.  Uh-huh.

22  Q.  Including the plasma TV?

23  A.  That was something I was considering.

24  Q.  Okay.

25          MS. NeSMITH:  May I have a moment?

Craig Robert Wiggen - Redirect

```
 1                THE COURT:  You may.

 2                MS. NeSMITH:  No further questions, Your Honor.

 3                THE COURT:  Mr. Morris?

 4                MR. MORRIS:  Briefly, Judge.  Thank you.

 5                       REDIRECT EXAMINATION

 6   BY MR. MORRIS:

 7   Q.  Mr. Wiggen, Ms. NeSmith asked you about the six or seven

 8   cards on what's been marked as Government's Exhibit A.  Do

 9   you know whether or not all of those cards were still usable

10   or that data was still usable?

11   A.  I do not.

12   Q.  Okay.  Is it possible that that data winds up containing

13   information for cards that were no longer usable?

14   A.  It's very possible.

15   Q.  And, as I understand your testimony, your testimony is

16   that you did not intend to further use those cards, correct?

17   A.  That's correct.

18   Q.  You did have an intention to use the two cards, though,

19   that you retained?

20   A.  Yes.

21   Q.  You mentioned I believe a plasma TV charging on to the

22   dentist's card, correct?

23   A.  (Nods head.)

24   Q.  Did you make any plans as to where you may have purchased

25   that from?
```

*Craig Robert Wiggen - Redirect*

1    A.   I was looking at one at Wal-Mart.

2    Q.   Okay.  Any ballpark as to the approximate cost?

3    A.   I believe it was $2200 for a 40-inch.

4    Q.   For a 40-inch?

5    A.   Yes.

6    Q.   And you mentioned -- I believe it's Ms. Canaday's card

7    was the other that you had retained.  You mentioned that you

8    had intended to purchase a digital camera?

9    A.   Yes.

10   Q.   There is a wide range of digital cameras and the cost of

11   those.  Any particular type or dollar amount that --

12   A.   It wouldn't have been more than $400, due to the location

13   in which it could be used.

14   Q.   You would not have exceeded a $400 purchase for the

15   digital camera?

16   A.   That is correct.

17   Q.   After making a purchase for the plasma TV and the digital

18   camera, would you have made more purchases with the cards?

19   A.   Probably not with the one with the very large purchase --

20   not on the card with the very large purchase, no.  But on the

21   other one, I probably would have.

22   Q.   Okay.  Potentially you would have made more charges to

23   Ms. Canaday's card?

24   A.   Yes.

25   Q.   But not to the dentist's card?

*Craig Robert Wiggen - Redirect*

1   A.   That's probably how I would have done it, yes.

2   Q.   Okay.  And would your expectation have been the same with

3   respect to Ms. Canaday's card, in not exceeding that rough

4   tabulation in your head of roughly -- I think they used

5   $3,000, approximately?

6   A.   Because it was not an American Express card, it probably

7   would have been much less.  But I would not use it to exceed

8   that much.

9   Q.   Your research into property records or where people

10  reside or their, I guess, material wealth, was that a direct

11  correlation with how much you would charge to the card?

12  A.   Actually, I was -- I wanted to make sure that they were

13  Tallahassee residents.

14  Q.   Okay.  And I guess what I'm getting at is, you finding

15  out a person's assets or their property or things of that

16  nature wasn't to discern how much you could charge on the

17  card, was it?

18  A.   No.

19  Q.   What was the importance of them being Tallahassee

20  residents?

21  A.   I thought it would be harder for them to figure out how

22  the information was being obtained.

23          MR. MORRIS:  Tender the witness, Your Honor.

24          THE COURT:  All right.  Thank you, Mr. Wiggen.  You

25  may step down and return to counsel table.

1          Mr. Morris, additional evidence on behalf of

2   Mr. Wiggen?

3          MR. MURRELL:  The only thing additional on behalf of

4   Mr. Wiggen -- you mean as it relates to the guidelines items?

5          THE COURT:  Or any evidence.

6          MR. MORRIS:  Okay.  The only other item of evidence

7   that I would like to offer is what I have marked as

8   Defendant's Exhibit Wiggen A, which is the report of Richard

9   Alden Greer.

10          THE COURT:  All right.  Defendant Wiggen Exhibit A is

11   admitted.

12     **(DEFENDANT WIGGEN EXHIBIT A:**  Received in evidence.)

13          MR. MURRELL:  That's all of the testimony and/or

14   evidence on behalf of Mr. Wiggen, Judge.

15          THE COURT:  And I've read material from Dr. Greer.

16   Is this the same report I already have?

17          MR. MORRIS:  It is, Your Honor.

18          THE COURT:  Okay.  Thank you.

19          Mr. Murrell?

20          MR. MURRELL:  I have nothing that goes directly

21   towards this guidelines issue, but I do have some exhibits in

22   support of my request for a sentence less than called for by

23   the guidelines.

24          THE COURT:  Okay.

25          MR. MURRELL:  And here, again, you have seen most of

1    this, but I just wanted to make sure we had it in evidence.

2           Defendant's Exhibit Number 1 is Dr. Meyer's CV.  I'll

3    introduce that.

4           Defendant's Exhibit Number 2 is Dr. Meyer's report

5    that you have seen already.  I would ask the court to consider

6    sealing this report because of its sensitive nature.

7           And then I have Defendant's Exhibit Number 3.  These

8    are the letters that I have sent you already.  One from Dee

9    Rivers-Yowell, one from Jan Stetson, one from Mary Ann Morgan,

10   one from Melissa Boatman, and one from Stanley Levin.  These

11   are all paper-clipped together as Defense Exhibit Number 3.

12   Again, you have seen those.

13          One additional exhibit that you have not seen, I just

14   got it today, it's from a Mary Ann Etheridge who is a

15   psychologist.  She has been counseling Mr. Stetson as part of

16   the one -- it's one of the conditions of his pretrial release.

17   In Defendant's Exhibit 4, she mentioned that he has been

18   working at the counseling, complying eager in treatment, and

19   goes on to say he's expressed some remorse and sincerely wants

20   to make changes in his life.

21          So, those are the exhibits we would rely on to

22   support our request for a lesser sentence.

23          THE COURT:  All right.  Ms. NeSmith, any objections

24   to Defendant Stetson's Exhibits 1 through 4?

25          MS. NeSMITH:  No, Your Honor.

1          THE COURT:  And does anybody disagree with the

2    proposition that Dr. Meyer's report should be sealed?

3          MS. NeSMITH:  No, Your Honor.

4          THE COURT:  All right.  Then Dr. Meyer's report will

5    be maintained under seal.  That's Defendant Stetson Exhibit 2.

6          (**DEFENDANT STETSON EXHIBIT NOS. 1, 2, 3 AND 4:**  Received

7    in evidence.)

8          THE COURT:  Rebuttal evidence from the government?

9          MS. NeSMITH:  No, Your Honor, nothing further from

10   the government.

11         THE COURT:  All right.  Then let's address the

12   guidelines issue first.  They're the defendants' objections.

13   I'll let you argue first and last with respect to all of them.

14         MR. MORRIS:  Judge, with respect to the --

15         THE COURT:  And let me clarify one thing about the

16   status of the objections.  I think when the defense objection

17   was made it may have been an objection on behalf of

18   Mr. Stetson, because I think at that point the initial

19   presentence report afforded him no reduction for role.  It's

20   now been revised to give him a minor role reduction.  So, if I

21   understand the situation, Mr. Stetson asked for minimal

22   reduction, or a three-point reduction rather than the two.

23         Does the government object to the minor role

24   reduction?

25         MS. NeSMITH:  Yes, Your Honor.

1          THE COURT:  All right.  So, the question is what the

2    role should be.  All right.

3          And then argument, Mr. Morris?

4          MR. MORRIS:  Judge, the argument on behalf of

5    Mr. Wiggen as it relates to the guidelines is the amount of

6    the loss and/or intended loss.  It's Mr. Wiggen's position

7    that the actual loss is evident.  I believe it's noted as

8    $10,763.31.

9          Judge, Mr. Wiggen has provided testimony and the

10   evidence before the court with respect to the normal scheme

11   and the normal process.  The large majority of the cards wound

12   up being destroyed -- and they are actually itemized and

13   listed on page 7 of the presentence report, Judge.  That the

14   only two that wound up being retained were those cards

15   belonging to Dr. Hubbard as well to Ms. Canaday, and I believe

16   the evidence and the testimony before the court is that

17   Mr. Wiggen did intend to wind up using those credit cards to

18   make additional purchases.  I think the testimony reveals

19   roughly $2,200 for a plasma TV and $400 for a digital camera.

20         Mr. Wiggen did wind up testifying that he probably

21   would have used Ms. Canaday's credit card to make additional

22   purchases.

23         What I think is compelling, Judge, is Mr. Wiggen

24   wound up -- you know, the government in large part, I'm

25   certain, will argue that he intended to max out the cards.

1    There is really no evidence of him intending to max out the

2    cards.  In fact, I think the evidence is a bit to the contrary

3    in that Mr. Wiggen's scheme contemplated the fact that

4    credit-card merchants or cardholders may wind up becoming wise

5    to large purchases or volumes of purchases, and that the

6    testimony and evidence before the court is that the

7    purchases -- his general expectation was that they not exceed

8    roughly $3,000.

9         It is Mr. Wiggen's position that Your Honor should

10   contemplate the amount of loss as being the actual loss as

11   well as adding $2,200 for the intended loss and purchase with

12   Dr. Hubbard's card, as well as the $400 intended in addition

13   to what's already shown on Ms. Canaday's card.

14        Your Honor, I think that there is a great deal of

15   reason to put faith in what Mr. Wiggen has said before the

16   court.  One reason being is, I don't think that there is any

17   disagreement from Investigator Thompson or Mr. Wiggen that he

18   winds up admitting that, "I've destroyed these cards.  I'm no

19   longer going to use them."  And certainly we can suspect that

20   he intended to use them at a future point in time, and things

21   of that nature, but he winds up being candid and admitting

22   what cards he still has and what cards he winds up retaining.

23   He admitted that to the investigator and winds up advising

24   that, "I had gotten rid of the encoder.  I'm no longer going

25   to use it."

PDF created with pdfFactory trial version www.pdffactory.com

1          Certainly, we can suspect or surmise that he could

2    have purchased another one, but I don't believe that there is

3    any evidence to indicate that that was the case or that

4    Mr. Wiggen wound up having usage of the data.

5          The document that the government has introduced,

6    Judge, which I believe is Government Exhibit A, listing the

7    credit-card data on the computer, also I asked Mr. Wiggen this

8    question during his testimony as to whether or not he knew or

9    didn't know whether all of that data could be used, and my

10   recollection of Wiggen's testimony is that he wasn't certain.

11   Some of the accounts may have already been closed.  Some of it

12   may have been unusable, and things of that nature.

13         I don't believe that the guidelines intended for Your

14   Honor to speculate as to what something -- what a credit-card

15   limit is.  Certainly, we have drawn speculation into what the

16   credit-card limits may be in calculating the guidelines.  I

17   think that the guidelines were intended to wind up being not

18   such a fluid notion that it needs to go immediately to the

19   credit-card limit.  I think that the guidelines were intended

20   for Your Honor to take into consideration what is the actual

21   intended loss.  And I think that we wound up providing that

22   intended loss.

23         That is the only objection, Judge, that we have with

24   respect to the calculation of the guidelines, per se.  I do

25   have Mr. Wiggen.  There are some issues as they relate to

PDF created with pdfFactory trial version www.pdffactory.com

1   mental-health issues that I would like to address.  I'm happy

2   to do so now, if Your Honor would like, or it may be more

3   appropriate --

4            THE COURT:  Let's hold that one.

5            MR. MORRIS:  Yes, sir.

6            THE COURT:  All right.  Mr. Murrell?

7            MR. MURRELL:  Judge, if you will bear with me, what I

8   would like to do is hand you Government's Exhibit B, because

9   there's some parts of it that I would like to point out to

10  you.

11           THE COURT:  All right.

12           MR. MURRELL:  I think you have it now.

13           THE COURT:  I do.

14           MR. MURRELL:  While this is turning on, if you go to

15  page 4, I might explain some of this.  That is from Tape 3.

16  It is an interview that took place on March the 10th, and the

17  portion that we had intended to introduce begins after that

18  dotted line there on page 4.  And, again, after that dotted

19  line, we're on Tape 3, you'll note on pages 4 through the end

20  of the document, there are some sections that are in gray.  It

21  doesn't have any real bearing here, but I will explain why

22  they are in gray.

23           We had come up with our own translation and sent

24  those to the government, and they sort of improved upon it,

25  and those sections in gray are simply those sections that the

PDF created with pdfFactory trial version www.pdffactory.com

1    government was able to improve upon.  There is no dispute

2    about the content.

3           The areas that I put in bold, I did because I wanted

4    to emphasize them, and I thought that they were of some value.

5           I'm showing you page 4, just after that dotted

6    line -- I'll point this out, although it's not relevant to

7    this argument, but -- you'll see there in talking to

8    Mr. Wiggen, Mr. Wiggen says, "I found out Josh was working at

9    a restaurant.  He was extremely desperate for money."  I'll

10   come back to that, but I simply point that out to you.

11          But the other thing I wanted to point out on this

12   page is a few lines down from that, and I think it does give

13   you a pretty good indication of what Mr. Wiggen was doing, and

14   we heard testimony about that.  Mr. Wiggen said, "I was able

15   to stock up on clothes, food, liquor, and then purchase and

16   sell enough to pay for the encoder, pay for the reader, get my

17   bills caught up."

18          This is not a fellow that was going out and buying

19   tens of thousands of dollars' worth of merchandise.  He was

20   making relatively small purchases -- clothes, food, liquor and

21   things like that.  And I think that is entirely consistent

22   with what Mr. Wiggen has told you today.

23          The other part I wanted to show you -- oh, I'm

24   sorry -- is on page 5.  This is not a section I highlighted.

25   It's in what is the third -- what I would call the third

PDF created with pdfFactory trial version www.pdffactory.com

1    paragraph of that portion I displayed here.  And, if you read

2    that it says what Mr. Wiggen says, "That reminds me, I found

3    this in my desk.  It's a little gift card.  There's a chance

4    that may be encoded, but it's highly unlikely.  What it

5    probably was was some merchandise that I purchased and

6    returned for store credit."  And they talk about that a little

7    more in the paragraphs to follow.  But I cite that for this

8    purpose:

9            The government seems to question Mr. Wiggen's

10   credibility and whether he really destroyed the cards or

11   whether he really destroyed the encoder.  Here is an example

12   where he was bringing to them a card he had found, and I would

13   suggest that is entirely consistent with the fact that he has

14   now decided to tell the truth.  He is bringing to them

15   evidence, information they did not have and certainly had no

16   need to produce.  So, that's why I mentioned that.  I think it

17   does show a lot about Mr. Wiggen's credibility.

18           And, finally, it's over here on page 8, the bottom of

19   page 8, rather than bringing it up here, I'll just read it to

20   you.  It's the last couple of lines.  Investigator Thompson --

21   and he testified to this -- she says, "You're telling me

22   basically that you're quitting, right?"  He says, "Yeah."  And

23   she goes on in the next page to say, "You were going to sell

24   your skimmer and you destroyed your encoder?

25           "Uh-huh."

PDF created with pdfFactory trial version www.pdffactory.com

 1          And that I think is critical to the argument here.

 2   You know, the test in arriving at the loss is not what is the

 3   credit-card limit.  The test is what is the actual loss or

 4   what did the individual intend.

 5          Of course, Mr. Stetson is tied to Mr. Wiggen's wagon

 6   here, since he is viewed as a co-conspirator.  But I think

 7   that it's pretty clear in this case what he intended.  To

 8   begin with, all of the credit cards, but two, have been

 9   destroyed, and the encoder had been destroyed.  That's the

10   testimony.  There's nothing that contradicts that.  They

11   certainly didn't come up with an encoder or credit cards.  I

12   think that is about as good of evidence that there could be of

13   what he intended.  He had quit, just like he told the

14   investigator.  He was done with this, except for these last

15   two cards.

16          So, we don't have to guess what he intended on these

17   cards.  We know.  And he intended to inflict, it turns out,

18   about $10,000 worth of damage.  That's what he did.  That's

19   what he intended to do.  And that is entirely consistent with

20   his statement saying that he was just buying food, catching up

21   on his bills, and liquor and clothing.

22          So, again, if that's the question, what he intended,

23   and that is the question, we know.

24          Now, the last two cards, it may be a little harder to

25   define, but here again we have some very specific testimony.

1   He said he was going to do something stupid maybe, maybe buy

2   this plasma TV, which is by his calculation $3,000 or less.

3   And I think that you can assume that he probably wasn't going

4   to spend more than 3- or $4,000 or purchase more than 3- or

5   $4,000 on this other card that belonged to Ms. Canaday.

6        And beyond that, you have a track record of what he

7   actually did.

8        THE COURT:  Well, let me ask about what he actually

9   did.

10       How do I know that these items on the list are all?

11  I mean, he had wiped out his computers.  So, how do we know

12  there aren't 20 more people in Tallahassee who had used their

13  credit card at Tia's, whose card was used to make purchases,

14  and that we just don't know about?

15       MR. MURRELL:  Well, the answer is, there is no

16  evidence of that.  On the other hand, there is evidence about

17  what he intended and what he did.  You could say this --

18       THE COURT:  Fair enough, but I mean I don't have

19  evidence that they got it all.  There is no reason to think

20  they got it all, is there?

21       MR. MURRELL:  Well, if there is more, I would suggest

22  that it's the government's obligation to establish that.  It

23  certainly appears that we've got it all.  You have testimony

24  from Mr. Wiggen that all of these other cards were destroyed;

25  that this is what he did.  That's pretty solid evidence.

1          Now, I suppose you could say, I --

2          THE COURT:  Well, how would they get?  Because he

3     remembered it?  He didn't have any records.  Maybe I don't

4     understand.  That's why I'm asking.

5          MR. MURRELL:  This was done in 2004, the end of 2004.

6     We're now in 2006.

7          THE COURT:  Oh, I understand.  But they come to him

8     two or three months later.  This operation had gone on for

9     some time earlier, and they come, and he says -- and they have

10    some records.  They are able to find some people.  The reason

11    they find out about it was because one of the customers

12    complained, goes to the police.  And they run it down, and

13    Mr. Stetson provides information about Mr. Wiggen, and

14    Mr. Wiggen answers questions.  They are both cooperative.  I

15    understand that.

16         So -- but if I understand it, the way they get these

17    names is from what little records are left and I guess from

18    what Mr. Wiggen or Mr. Stetson remembers.  But what makes us

19    think that there's not a John Smith out there whose card was

20    stolen, was used and stuff was bought, and we just don't have

21    a record of it?

22         MR. MURRELL:  Well, to begin with, the government can

23    probably tell you more about this than I can.  But, you know,

24    it was Mr. Stetson that was giving these cards.  He was the

25    waiter at Tia's.  There was certainly a record of what cards

PDF created with pdfFactory trial version www.pdffactory.com

```
 1   he handled during this time period.

 2          THE COURT:  But that's got to be a very large number.

 3   I mean, I assume if he's a waiter at Tia's, he handles -- I

 4   don't know -- 20, 30 or 40 a night, doesn't he?

 5          MR. MURRELL:  Well, no.  Unfortunately, Tia's

 6   business was not that good.  But it's only a period of about a

 7   month.  So, I don't think -- a month or two months at the

 8   most.

 9          THE COURT:  So, if it's a month, and he does ten a

10   night, that's 200 -- you know, if he works 20 days, that's

11   200.

12          MR. MURRELL:  But he wasn't doing ten a night.  The

13   testimony is that he got maybe 16 cards.  I mean, this is

14   fairly explicit.  The testimony from Mr. Wiggen is that --

15   and, if there is any question about this, I suppose we can

16   call him back.  He said that Mr. Stetson skimmed about 16

17   cards, and he went on to say that he used about ten of them.

18   So, that's pretty good evidence as to the number of cards

19   involved.  He told you what he did.

20          So, we know I think with some certainty which cards

21   were used and which ones weren't.  This is not the sort of

22   thing where they were collecting names from all over the

23   place.  The name just came from one source, Tia's.  We have

24   testimony from Mr. Wiggen about roughly the number of cards

25   that were used.
```

PDF created with pdfFactory trial version www.pdffactory.com

```
1              So, I don't think that that's a realistic concern in
2     this case.  I can see in some cases it might be.  But mind
3     you, again, a year has past; and, if any of these people had
4     additional charges, presumably they would surface.  I don't
5     think the rule is, if we don't have any evidence about more
6     charges, we can assume that the guy intended to use the max.
7     I think the --
8              THE COURT:  Let me back up to explain the questions.
9     I don't mean to suggest that the government carries its burden
10    by my speculating on whether there are other transactions out
11    there.  But it does seems to me that when I go about analyzing
12    the facts, I need to know what evidence we have and what
13    evidence we don't have and how comprehensive our evidence is.
14    So, that's the reason for the question.
15             MR. MURRELL:  It's a fair question, but again I think
16    the evidence is from Mr. Wiggen, the testimony is truthful;
17    that he had got about 16 cards skimmed, and he used about ten.
18    You haven't seen -- you know, you haven't seen the whole --
19    the questioning of Mr. Wiggen went on for about two hours, by
20    my count.  But at one point, I can tell the court -- I don't
21    think there's a dispute -- he was asked, "Well, why didn't
22    Mr. Stetson copy more?"  And they talked about all that.  But,
23    again, we have a pretty good estimate that there were 16
24    cards, and only ten were actually used to come up with these
25    gift cards that were subsequently used.
```

PDF created with pdfFactory trial version www.pdffactory.com

1           So, I think we have a pretty good handle on it.  So,

2     again, this is not the kind of case -- you know, the one case

3     I cited in my memo, by the way, that authorizes the use of the

4     credit-card limits --

5           THE COURT:  Shamloo and Dominguez.

6           MR. MURRELL:  That's it.  The defense did not

7     introduce any evidence as to what was intended.  So, in that

8     case, the Eleventh Circuit said, "Yes, it would be reasonable

9     to use the limits."

10          Here, it's a different circumstance.  We have given

11    you evidence, testimony about what was intended from

12    Mr. Wiggen.  As you look at the way the credit cards were

13    used, it seems to be entirely consistent with what he had to

14    say.  I think there is every reason to accept his testimony as

15    credible and to find that we do have an actual loss of

16    $10,700, and that the only other loss he intended to inflict

17    was roughly another $6,000.

18          THE COURT:  All right.  Persuade me that I should

19    credit the testimony that he wasn't going to use any of the

20    other cards anymore.

21          MR. MURRELL:  Well, again, I cite that one example

22    there where he sort of went out of his way to turn in a card

23    that he still had.  That was in that Tape 3.

24          THE COURT:  Right.  But that's after the heat was on.

25          MR. MURRELL:  Right.

PDF created with pdfFactory trial version www.pdffactory.com

1       THE COURT:  And so it's not at all unusual for

2  somebody to stop when the heat is on, and it's not unusual --

3  not always easy to understand, but -- it's not unusual for

4  somebody to say, "Here's some more stuff," and turn over more

5  evidence.  It's fairly unusual for somebody voluntarily to

6  quit before the heat is on.  It sometimes happens.  And, if it

7  does, it's important to me.  Frankly, that's an important

8  consideration.  But how do I know in this case that he really

9  quit before the heat was on, instead of saying, after the heat

10  was on that he had quit?

11       MR. MURRELL:  Well, it makes sense for a couple of

12  reasons.  If you look over on pages 9 and 10, this is in bold

13  here, what Mr. Wiggen is saying was, he felt like that was all

14  he could get out of Tia's.  He didn't want to be discovered;

15  and, if you look at the bottom of page 9, we've got Attorney

16  Ege saying, "You were worried that they were going to find

17  Tia's?

18       "Investigator Thompson:  Too many Tia's, right?

19       "Wiggen:  What's that?

20       "Too many Tia's, too many people using Tia's?

21       "Wiggen:  Yeah, right."

22       That's why he quit, because he used these credit

23  cards enough from Tia's.  He was concerned about being caught.

24       So, I think that is one reason to credit his

25  testimony.  It makes sense.  And if you read through this,

PDF created with pdfFactory trial version www.pdffactory.com

1    what he had said was that he had tried to use -- I forget the

2    terminology, but -- this bug or this device that you just put

3    on the computer, and that records the credit-card numbers.  He

4    used that at Applebee's, I believe.

5              THE COURT:  The KeyKatcher.

6              MR. MURRELL:  KeyKatcher.  That hadn't worked out.

7    So, this was Plan B, and he used this about as much as he

8    could at this point.  He had already collected the skimmer

9    from Mr. Stetson.  So, that in itself seems to show he

10   intended to stop.  He says he intended to stop.

11             As far as his credibility, he is there telling the

12   officer, "Yeah, look, there were two cards that I still had

13   and I was going to use.  In fact, I was going to even be

14   stupid and buy a plasma TV."

15             So, he's not a fellow saying, "Oh, yeah, I already

16   stopped."  He's a fellow that's saying, "I had stopped before

17   I heard anything about this, expect for these last two; and,

18   yes, I was going to use those."

19             I would think that carries with it a lot of

20   credibility.  He is not sitting down there figuring the loss.

21   He's not doing these loss calculations.  This is early on in

22   the case.  He's telling some things that are damaging, and I

23   think that indicates he's being truthful.

24             And I say he's saying things that are damaging, he's

25   saying he's still got two more cards that he intended to use.

PDF created with pdfFactory trial version www.pdffactory.com

1   On the stand there he said, "Well, you know, I was going to

2   buy that digital camera, but I probably would have used that

3   card some more, too," the card that belonged to Ms. Canaday.

4          So, I would suggest he has given you testimony that

5   is entirely credible, and that's why you can believe it, and

6   that's why you can rely upon it in arriving at these

7   guidelines calculations.

8          I might just finish in doing one thing.  This is how

9   I see the guideline calculations should be in Mr. Stetson's

10  case.  He should get six for the base level.  He should get

11  four for the loss.  My position is that the loss is less than

12  $20,000.  That would give him ten.  He should get two, because

13  there were more than 12 victims.  He should get another two

14  levels because of using access devices, which gets him up to

15  14.

16         This business about minor role, the question is it

17  should be two or four.  And, frankly, in my view the amount of

18  the loss is dependent upon that.  I think that, if you were to

19  consider the loss to be $178,000, I think it should be four.

20  His role in securing what presumably was intended by

21  Mr. Wiggen is small in comparison to that sort of loss.  I

22  mean, his gain is a tiny fraction of that $178,000.  On the

23  other hand, if you contend that the loss is something more

24  like I'm suggesting, he's not being penalized so much by what

25  Mr. Wiggen did, and I think certainly two would be fair

PDF created with pdfFactory trial version www.pdffactory.com

1    enough.

2            So, that's what I'm saying here.  He's at Offense

3    Level 14.  You subtract two for minor role, two for acceptance

4    of responsibility, because at that point we would be down

5    below 16, and that would leave him at Offense Level 10, which

6    places him in the six to 12 months, but it's Category B, which

7    means that you could substitute home detention for

8    incarceration, if you thought it was appropriate.

9            So, that is -- that's how I calculate it, and that's

10   what I maintain is the correct calculation in Mr. Stetson's

11   case.

12           THE COURT:  All right.

13           Mr. Morris, you were trying to say something that you

14   feel strongly about.

15           MR. MORRIS:  There are two issues that I think are

16   compelling in addition to what Mr. Murrell articulated as it

17   relates to the intended loss issue.

18           First of all, if you note, the victims or the amounts

19   that are listed in the presentence report versus the actual

20   data recovered, at some point in time, clearly, evidence

21   through Mr. Wiggen's own admissions, he winds up placing

22   himself on the hook for having used other people's data and/or

23   credit cards.  That is one reason that I find it atypical that

24   an individual winds up admitting to -- sometimes defendants

25   admit to part and parcel to jockey for position.  I think that

PDF created with pdfFactory trial version www.pdffactory.com

1    in Mr. Wiggen's instance, he winds up admitting all of the

2    various victims and things of that nature.  He winds up

3    admitting which ones had been destroyed and which ones had

4    been retained.  I know that Mr. Murrell highlights that.

5           The other thing --

6           THE COURT:  My concern was that there were victims he

7    couldn't remember.

8           MR. MORRIS:  Right.  Bear in mind, Judge, the

9    computer was seized.  Mr. Wiggen's testimony was that he

10   believed that encrypted file had been deleted or long since

11   deleted, which obviously it wasn't.  But I would surmise that

12   that data would have been retained in an encrypted file just

13   the same as this was.

14          The only other item that I wanted to note is, I was

15   trying to tease the common scheme or the common practice that

16   Mr. Wiggen usually used, and I think that I think of it in a

17   very common sense way that, you know, I've had instances where

18   I've made a charge to my own credit card, which may be a large

19   purchase or something of that nature, and the merchant says,

20   "Wait a minute.  It says that we need to call the credit

21   cardholder," and then you wind up on the phone answering the

22   question about where you made the last purchase to be able to

23   verify that it's actually your card, you're the cardholder,

24   et cetera.

25          I think that that's important because the scheme, as

PDF created with pdfFactory trial version www.pdffactory.com

1  Mr. Wiggen describes, describes a course of conduct where

2  there were certain expectations that they wouldn't exceed

3  certain dollar amounts and things of that nature, and I think

4  that common-sense approach to the scheme provides credence or

5  credibility to the way that Mr. Wiggen describes it in terms

6  of what his intentions are.

7          THE COURT:  All right.  Thank you.

8          Ms. NeSmith?

9          MS. NeSMITH:  Yes, Your Honor.  First, with regards

10  to Mr. Stetson on the issue about the minor role adjustment,

11  the government does object to such an adjustment.  We rely on

12  the fact that the defendant's role, Mr. Stetson's role, was

13  quite essential in carrying out the scheme, mainly because the

14  customers actually entrusted him with their credit-card

15  information, and he's the one who betrayed that trust.  And

16  without him -- but for his involvement, Mr. Wiggen would not

17  have acquired that information.  So, we would object to a

18  minor role adjustment.

19          And, additionally, we argue that he definitely should

20  not be given a minor role adjustment in addition to a downward

21  departure.

22          With regards to the intended loss, it is easy for

23  Mr. Wiggen to come today and say that he did not intend to use

24  the cards any longer.  He admits that he did intend to use the

25  last two cards, and he further admitted that he could have

PDF created with pdfFactory trial version www.pdffactory.com

 1    used the information that was still on his computer.

 2           Now, mind you, that was the computer which was turned

 3    over to law enforcement after he had learned the fact that

 4    they were investigating him.  He voluntarily turned over the

 5    computer, only that computer.  We do not know if he any other

 6    computers or he had information stored someplace else.  And

 7    that information, as he admitted, could have been used,

 8    because he could have purchased another encoder and made

 9    additional cards.

10           Furthermore, we argue that it is clearly Mr. Wiggen's

11    intent to have used the cards until he couldn't use them any

12    longer.  He said that he used the cards -- I believe he said a

13    maximum of $500 a day.  He would use them until they were

14    dead.  Well, "dead" means until he couldn't use them any

15    longer.  Basically, either the credit-card company wouldn't

16    allow him to use them anymore or they reached the limit.  So,

17    with that, we feel as though the intended loss should, in

18    fact, reflect the credit-card limit.

19           With regards to the defense argument that the court

20    should not have to --

21           THE COURT:  How would he get to the limit?  I mean,

22    one of these, for example, is a $20,200 limit.  How would he

23    use that much credit on that card?

24           MS. NeSMITH:  Well, he could start by purchasing the

25    plasma television.

PDF created with pdfFactory trial version www.pdffactory.com

1          THE COURT:  Oh, I understand.  Okay.

2          MS. NeSMITH:  He could continue using the card making

3     large purchases.

4          THE COURT:  And you think if he ran up -- you think

5     he could do it.  He could use $20,000 in a single-billing

6     cycle.  But as soon as the bill hits the customer's account,

7     it's over, right?  As soon as the customer looks at the bill,

8     that card is gone.

9          MS. NeSMITH:  I would agree.

10          THE COURT:  And because --

11          MS. NeSMITH:  It should be.

12          THE COURT:  -- this is an actual card with a living,

13     breathing customer.

14          MS. NeSMITH:  Correct, yes.

15          THE COURT:  All right.  And if he makes a couple of

16     big purchases like that, we all rely on our common

17     experiences -- in my case, they call and they say, "Did you

18     really buy the stuff?"  I mean, if he buys a plasma TV, and

19     then he buys something expensive the next day, he's going to

20     get a call from the credit-card company saying, "Did you buy

21     this stuff?"

22          MS. NeSMITH:  We would like to think that credit-card

23     companies routinely call their customers and let them know of

24     large purchases like that, but I'm sure there are occasions

25     where that does not happen.

1          THE COURT:  But if you have the card and you want to

2    maximize your usage of it, you don't go spending.  That's what

3    he said.  That rings true, and he's trying to maximize its

4    use.  So, he's not going to spend $4,000 today and $4,000

5    tomorrow.  He's going to try to spend no more than 200 at a

6    spot and less than 500.  If he gets the plasma, it's going to

7    be the last time he uses that card, probably.

8          That's my question.  The government wants the amount

9    of loss to be $20,200, and I'm just wondering how he would do

10   that.  I mean, how would you do that?  It just seems to me

11   that it would be very hard to do it.  That's a hundred days at

12   $200 a day, 50 days at $400 a day.

13         MS. NeSMITH:  I would agree with that; yes, Your

14   Honor.  But not everyone is cognizant of what exactly is on

15   their credit-card statement.  Not everyone pays attention to

16   what's on their credit-card statement.  So, if you had

17   customers who didn't really pay attention to what was on their

18   credit-card statement, then it is very well possible that he

19   could have continued using the cards for more than the regular

20   billing cycle.  And that's how --

21         THE COURT:  But if you were trying not to get caught,

22   you know not to use the card after -- I mean, you know, you

23   run it through that little machine.  If the message comes up

24   to the clerk, "Don't let this guy out of the store, that's a

25   stolen card," that's a problem, right?

PDF created with pdfFactory trial version www.pdffactory.com

1          MS. NeSMITH:  That's true.  Yes, Your Honor.  Again,

2    we would argue that he had access to more than just these 16

3    cards.  He had access to other customers at Tia's that

4    Mr. Stetson dealt with.  We're just relying on the information

5    that we were able to determine based on the information from

6    Mr. Wiggen's computer.  That's what we're relying on.  I think

7    it's unreasonable for us to have to research all of

8    Mr. Stetson's customers, you know, for the last six months, or

9    whatever, during that time period.

10          THE COURT:  Fair enough.  All right.

11          Rebuttal?

12          MR. MURRELL:  Yes, sir.  One other thing that

13   occurred to me when you were evaluating Mr. Wiggen's

14   credibility.  Now, he told them about all of this activity

15   that took place preceding this incident.  He went out of his

16   way to tell them about information they did not know about.

17   So, I think that says something about his credibility.

18          As for the minor role reduction, she said that but

19   for Mr. Wiggen's -- or Mr. Stetson's role this couldn't

20   happen.  Well, that's true; but, as I pointed out in my letter

21   to Ms. Wilson, even if he played an essential role, under some

22   circumstances --

23          THE COURT:  I understand that's the drug courier

24   issue.

25          MR. MURRELL:  Right.  And the fact that he betrayed

PDF created with pdfFactory trial version www.pdffactory.com

1  the trust of these customers, I think that is certainly

2  nothing to be proud of, but I don't think that affects this

3  minor role claim.

4       I might say, too, that I don't think the issue is

5  what could have been done with this information that was, for

6  example, still on the computer.  The issue is what Mr. Wiggen

7  intended to do, and I think we've shown you what he intended.

8       And, finally, I think, his testimony should be clear

9  on one point.  He did say, yes, he intended to use the cards

10 until they were dead, but he went on to say, "There were some,

11 but they weren't dead yet, and they got up to around $3,000,

12 and I stopped using them."  So, I don't think he was saying

13 that he ever intended to use all of these cards until they

14 were unusable.  I think he said he used the cards until, (a),

15 either they became dead; or, (2), I got to this limit that I

16 thought was high enough that might still fly under the radar.

17      So, again, I would suggest his testimony is credible.

18 As far as your concern that these other things, there might be

19 other cards out there; again, what I stated earlier was --

20      THE COURT:  You're okay with that.

21      MR. MURRELL:  Okay.  I don't have anything further.

22      THE COURT:  Mr. Morris?

23      MR. MORRIS:  The only rebuttal that I have, Judge, is

24 not necessarily rebuttal, only to note that it is Mr. Wiggen's

25 position that, also in the category scoring, the specific

PDF created with pdfFactory trial version www.pdffactory.com

1    offense characteristics, and I think Your Honor should glean

2    from my argument that we would be of the position that it

3    would be four points there.

4            THE COURT:  For the loss?

5            MR. MORRIS:  Yes, sir.  Same thing that Mr. Murrell

6    articulated, Judge.

7            THE COURT:  All right.  Here are my rulings:

8            First, with respect to the minor role, I find that

9    Mr. Stetson did play a minor role.  I find that he did not

10   play a minimal role.  The reduction of the offense level in

11   which he is entitled is the two points as calculated in the

12   presentence report.

13           I will say on that that I think that the ruling is

14   easy that he doesn't get more than two points off.  I think

15   the ruling that he gets two points off is close and difficult.

16   My conclusion is that he qualifies for a minor role adjustment

17   but just barely.

18           The note on the minor role provision refers to

19   someone being substantially less culpable than the average

20   participant in a scheme.  That is not the easiest provision in

21   the guidelines to apply.  It's certainly true in this case

22   that Mr. Stetson is substantially less culpable than

23   Mr. Wiggen.  He's less culpable, it seems to me, than the

24   person who helped set this in motion, Mr. Bojan.

25           But applying the minor role adjustment is not as easy

1   as counting people, and the case law in the circuit makes that

2   clear.  The De Varon case, the en banc decision of the

3   Eleventh Circuit, is the leading case on the applicable

4   standards.  I have considered those.  Under all of the

5   circumstances, my conclusion is that Mr. Stetson did play a

6   minor role.

7         With respect to the amount of the loss, my finding

8   that the best estimate of the amount of the loss is, if I have

9   done the math right, just under $43,000.  The way I have

10  calculated that is this:

11        There were 11 cards.  The highest loss on any of the

12  cards was $3,902.  Coincidentally, the highest actual loss was

13  the card with the lowest limit.  I don't think the limit has

14  much, if anything, to do with the loss that was intended in

15  this case.

16        Six of the cards had an actual loss of zero.  I'm

17  taking this out of Mr. Wiggen's presentence report, paragraph

18  15.  Six of the cards had an actual loss of zero.  I don't

19  think it's reasonable to say that the intended loss on those

20  cards was zero.  The reason these cards were taken, copied and

21  encoded was so they could be used to engage in fraudulent

22  transactions.

23        I do credit Mr. Wiggen's description that he intended

24  to use these in a manner to minimize the chance of detection,

25  not to use them too fast, not to use them for overly-large

PDF created with pdfFactory trial version www.pdffactory.com

1    purchases, except perhaps with respect to the last one with

2    the plasma TV that he might have intended to buy.

3            Where that leaves me is saying that the credit line

4    here is not the number that should be used.  On the other

5    hand, I don't think zero should be used for the cards that

6    weren't -- on which there was no actual loss.  It seems to me

7    reasonable to conclude that Mr. Wiggen intended to use the

8    cards until he used them up, as he described it; and that's

9    not the credit limit, that's some amount that you can get to

10   before you get caught through the billing cycle or somehow the

11   card gets turned off.

12           The best evidence that we have of that -- it's

13   certainly not conclusive.  The law only requires that I make a

14   reasonable estimate.  I think the best estimate I can make,

15   the best evidence I have is to look at it and say, "Well, he

16   got to $3902 with one card, he got to $3897 -- I think just $5

17   less -- with another card.  So, he's got two cards where he's

18   right at $3900.  That's probably a good indication of how much

19   he could actually do on the card.  If you take 11 cards at

20   $3900, that's $42,942.  A few dollars one way or the other

21   doesn't make any difference.  The category in the guidelines

22   runs from 30,000 to 70,000.  My conclusion is that the best

23   estimate of the amount of intended loss is more than $30,000,

24   less than $70,000.  That's my finding in that respect.

25           I think that's an eight-point increase rather than a

1    four-point increase as requested by the defense, and rather

2    than a 12-point increase, which I think was calculated in the

3    presentence report.

4           In that respect, let me address the two Eleventh

5    Circuit cases.  There are two cases where the Eleventh Circuit

6    approved using the credit line as the amount of loss in a

7    credit-card case.  More specifically, what the Eleventh

8    Circuit held was that the district court did not clearly err

9    by using the credit limit.  The circumstances were a little

10   different.  As the court made clear in each of the cases, it

11   depends on the evidence and the facts of the case.  One of the

12   cases is United States versus Nostari-Shamloo, 255 F.3d 1290,

13   an Eleventh Circuit case from 2001.  One is United States

14   versus Dominguez, 109 F.3d 675, an Eleventh Circuit case from

15   1997.

16          In the Nostari-Shamloo case, the defendant stole mail

17   and then applied for credit cards.  So, these were not credit

18   cards that had already been issued and were, in fact, credit

19   cards of a real person.  Presumably, the bills then were going

20   to be sent as Nostari directed them on the application.  He

21   clearly knew the credit limit, because he's the one that

22   applied for the card, and he presumably had a better way of

23   keeping the customer from finding out when the first statement

24   came.  So, he probably could keep the card longer by avoiding

25   having any statements sent to the actual person.  Under those

PDF created with pdfFactory trial version www.pdffactory.com

1    circumstances, it seems to me the credit limit is probably a

2    reasonable estimate of the intended loss.

3            But that's different from a case like this one, where

4    it is an existing card that belongs to a real person.  In that

5    instance, it may be possible to use the card for more than the

6    one billing cycle, but for the most part you get one billing

7    cycle out of that card.  And you can't control the address to

8    which the statement is sent.  The statement gets sent to the

9    real person, so the person gets the statement and can put an

10   end to it.

11           Dominguez is a little bit in between the two cases.

12   That was the case where the defendant was selling cards, and

13   the government set up a controlled buy of counterfeit or

14   stolen cards, both.  The reference in the decision seems to

15   indicate that the defendant had some cards that were stolen

16   cards.  That would be closer to the case at-bar.  Some that

17   were counterfeit cards, which would be more like Nostari.

18           The purchase price of the cards was based on the

19   credit limit.  I don't remember the percentage.  It may have

20   been 15 percent.  That was the price at which the defendant

21   was selling the cards.  Well, when the defendant is selling

22   the cards based on a percentage of the credit limit, it seems

23   to me reasonable to think that the credit limit had some real

24   significance in the transaction.

25           In our case, in contrast, there is no indication that

PDF created with pdfFactory trial version www.pdffactory.com

1  the defendants knew what the credit limit was, or that they

2  knew how much credit was already outstanding on those cards.

3  These were not cards with no balance.  Presumably, there's

4  already some money owed on these cards.  So, again, there is

5  no reason here to think that the credit limit is a good

6  indication of the intended loss.

7          Now, each side takes issue with some of the rulings,

8  but given those rules, let's calculate the offense levels.

9          In Mr. Wiggen's case was I right that it's 12 that

10 were added in the presentence report for the amount of loss?

11 No.  It's ten.  I'm sorry.  Ten had been added.  And my ruling

12 calls for six?  Okay.  That's where the gap is.  So, it's four

13 levels less.  So, the Offense Level is 15 and the Criminal

14 History Category is I.  Is that right?

15         PROBATION OFFICER WILSON:  Yes, sir; that's what I

16 came up with.

17         THE COURT:  For Mr. Wiggen.

18         MR. MORRIS:  For Mr. Wiggen; that's correct, Judge.

19         THE COURT:  All right.  And that produces a

20 guidelines range of 18 to 24 months.

21         MR. MORRIS:  Yes, sir.

22         THE COURT:  And then in Mr. Stetson's case, the base

23 is six -- it's six for the amount of loss, two for more than

24 12 victims, two for an access device, that's 16, less two for

25 minor role is 14, and a two-level reduction for acceptance.

1    So, the overall calculation is 12.

2              MR. MURRELL:  Yes, sir, I agree with that.

3              THE COURT:  And Criminal History Category I.

4              With the defense having preserved objections to the

5    amount of loss calculation and in Mr. Stetson's case to the

6    failure to give more than two levels, and the government

7    having preserved an objection to I guess the amount of loss as

8    I calculated it, and also to the two levels afforded to

9    Mr. Stetson, the range is 10 to 16 months for Mr. Stetson, and

10   it's in Zone C.

11             Under United States versus Booker, of course, I'm

12   required to calculate the guidelines and to consider them.  I

13   also am to consider all of the factors under 18, U.S.C.,

14   Section 3553(a), and I can impose a sentence above or below

15   the guidelines range, if that's my determination under

16   3553(a).

17             Also, as part of considering the guidelines, I

18   consider any basis within the guidelines manual for a

19   departure, and that's been requested, too.

20             So, I can hear from the defense on the question of

21   what the sentence should be in light of this calculation of

22   the guidelines range, including issues arising either with

23   respect to the departures or under Booker.

24             Mr. Morris?

25             MR. MORRIS:  Thank you, Judge.

1          Judge, Dr. Greer's report, which I noted or which I

2    provided to Your Honor and Ms. NeSmith as well, Judge, I think

3    from a mental-health perspective, what's very important to

4    understand as it relates to Mr. Wiggen -- and, Your Honor, you

5    will hear I anticipate from him, and I know that his father

6    may want an opportunity to briefly address the court.

7          THE COURT:  He can do that.

8          MR. MORRIS:  It's not an excuse, is what is very

9    important to Mr. Wiggen, but I think what's wound up happening

10   is his diagnosis, he wound up learning his diagnosis as being

11   schizophrenic or having different mental illnesses where it

12   flew under the radar screen for quite some time, where it was

13   believed that he may have depression, and he winds up being

14   medicated.  Not until this criminal conduct arises does

15   Mr. Wiggen wind up being diagnosed as paranoid schizophrenic

16   and winds up receiving doctor's care.

17          I think what is important for the court to recognize,

18   and it's something that I articulated in my sentencing

19   memorandum and objections as something not a -- it may be

20   provided for in the guidelines for Your Honor's consideration,

21   or in the alternative, but it's not provided for in the

22   guidelines sufficiently enough.

23          Mr. Wiggen's conduct, as Dr. Greer details, and I'm

24   certain that Your Honor winds up having experience with people

25   who have mental illness, in some it comes down to the fact

PDF created with pdfFactory trial version www.pdffactory.com

1    that Mr. Wiggen is not wired the same way that you and I may

2    be.  He has great difficulty in dealing with pressures;

3    pressures such as what is evident in this case.  Most of the

4    purchases were for food, clothing, alcohol and, in some

5    instances, I think power tools.  The pressures that

6    immediately arose from Mr. Wiggen were an inability to cope or

7    to understand how to cope with paying bills, paying rent,

8    making sure that the electric bill was paid.  And, as

9    Dr. Greer opines, Mr. Wiggen, much like many other

10   mental-health individuals, reacts in a way that desires

11   short-term gain.  It doesn't bear any relation to long-term

12   gain or potential consequences, or things of that nature, but

13   it's to fix the problem as immediately as we can, which was

14   paying the bills, and it really functions without regard to

15   the consequences inherent.

16        I think that, and as I articulated in the sentencing

17   memorandum, Mr. Wiggen can find little comfort in the fact

18   that, due to the results of his criminal conduct, he is now

19   identified the fact that he does have a major mental illness.

20        What is interesting to me -- and there are a couple

21   of different ways that this could be viewed.  Of course, we

22   were here for sentencing, and the night before sentencing,

23   Mr. Wiggen made an attempt at suicide.  I guess, if there is a

24   way of viewing that, is Mr. Wiggen trying to shirk

25   responsibility or avoidance, or things of that nature?  I

1  think it's more in harmony with exactly what I have

2  articulated, which Mr. Wiggen isn't capable of handling

3  certain circumstances without the guidance of a physician,

4  without the guidance of family support that work.  There are

5  certain things that are going to be needed to be tended to in

6  terms of a medication regimen, and things of that nature.

7       And, again, it's not an excuse for his conduct.  His

8  conduct is criminal in nature.  He recognizes that fact.  But

9  I think that it is important for the court to recognize that

10  there is a reason or a rationale why it occurred.  It's not

11  Mr. Wiggen recklessly harming or doing physical violence to

12  other people.  It's the result of his mind functioning in a

13  much different way, in a much different way that needs to be

14  regulated.

15       So, I would ask the court to take into consideration

16  Mr. Wiggen's mental illness in arriving at a sentence, and my

17  suggestion to the court is that Your Honor impose a downward

18  departure under these circumstances based on the mental-health

19  issues and based on those mental-health issues, their

20  contribution to this.

21       Factually, it's interesting, Mr. Bojan is not a party

22  at the table here.  But I think that a pretty good argument

23  could be made that Mr. Bojan likely wound up taking advantage

24  of a person who was not in a position to be able to make an

25  informed or proper decision about the appropriateness or

PDF created with pdfFactory trial version www.pdffactory.com

1  propriety of their conduct.

2          I don't take issue with what role Mr. Wiggen wound up

3  playing in this.  He is not a minor participant or anything of

4  that nature.  But I think it's important for the court to be

5  aware, which you are, that he was brought under the wing of

6  someone, and I would suggest to the court that his

7  susceptibility to that type of conduct, he was more

8  susceptible than an ordinary person.

9          Judge, a couple of personal notations that I have

10 made about Mr. Wiggen is during the plea colloquy that Your

11 Honor conducted, Mr. Wiggen often manifested answers to

12 questions with, when he became nervous or concerned about the

13 questions, there would be nervous laughter, things that would

14 strike a person as being inappropriate given the question, but

15 not inappropriate in the sense that he was non-responsive, but

16 inappropriate in the sense that Mr. Wiggen manifests

17 expressions or responses in a different way.  I noticed that

18 he did it today, too, in one of the answers to one of the

19 questions.  And it's because of those pressures and those

20 concerns, when he winds up answering or responding to a

21 question, that his illness winds up manifesting that way.

22          Essentially, Mr. Wiggen acted in a manner that the

23 court should not treat lightly, but at the same time I think

24 that the court should take into consideration the

25 mental-illness factors and the role that they may have played

PDF created with pdfFactory trial version www.pdffactory.com

```
 1    as it relates to a downward departure in Mr. Wiggen's case.

 2           Judge, I don't know if you would like to hear from

 3    Mr. Wiggen now.

 4           THE COURT:  Now would be the time.

 5           Mr. Wiggen, you don't have to say anything, but you

 6    are welcome to say anything you'd like.

 7           MR. MORRIS:  Judge, the only thing that I would

 8    preface his comments by is, his treating psychiatrist

 9    mentioned, if he is not able to get through the statement that

10    he's prepared, I asked him to write it so he doesn't stumble

11    along, but his treating psychiatrist suggested to pass it to

12    me if he is unable to make it through.

13           THE COURT:  All right.  Mr. Wiggen, why don't you

14    come to the microphone for me.  I'll hear you better.

15           DEFENDANT WIGGEN:  I want to thank you for allowing

16    me to make a statement.

17           I would like to say I accept responsibility for my

18    actions.  I regret that my conduct has impacted somebody else,

19    besides the victims, my parents, my family, this court, and

20    this community's financial system.  I'm sorry I involved

21    another individual in my conduct.

22           I recognize that I have mental-health issues, and I

23    am glad that these have come to light.  This is no excuse, and

24    it is a shame that it took so long for me to recognize this.

25    I'm stable.  I am getting better.  I'm being treated.  And I'm
```

```
 1    not offering this as an excuse.

 2           I have several short-term goals.  I would like to get

 3    through this.  I would like to pay restitution.  In the long

 4    term, I would like to finish college.  I would like to start a

 5    social responsible business, and I believe I can do that.

 6           THE COURT:  All right.

 7           DEFENDANT WIGGEN:  Thank you.

 8           THE COURT:  Thank you.

 9           MR. MORRIS:  Judge, the only other individual that

10    wishes to make a statement -- Mr. Wiggen's family is here, his

11    mother and his sister and brother, his brother's girlfriend,

12    but Mr. Wiggen, his father, would like to briefly address the

13    court.

14           THE COURT:  All right.  Mr. Wiggen, if you would come

15    up to the same microphone, please, sir.

16           I suspect I know the answer to this question, but if

17    you would first start by telling me your full name.

18           MR. WIGGEN:  My full name is Craig Wiggen, Sr.,

19    Wiggen, W-i-g-g-e-n.

20           I reiterate, I know when this happened, it was

21    recommended that we see a psychiatrist and didn't really think

22    that much of it, but we should check it out.  And in truth,

23    looking at it and seeing what happened, we were shocked.  Some

24    of the things that we just wrote off as college kid, taking a

25    little longer to get through school, and finding out later
```

PDF created with pdfFactory trial version www.pdffactory.com

```
 1   that he was not able to get up to classes, series of

 2   depressions.  I think one of the things I noticed was that the

 3   individuals he hung around, his good friends that he grew up

 4   with, one is now a successful attorney, he had a hard time.  I

 5   know that, after talking, he's felt that he's not been

 6   successful.  He didn't do as good as others, and he's always

 7   been gifted, honors classes.  It was a real surprise, and I

 8   think that he's realized and we realize that he's working with

 9   the psychiatrist, everything is coming out.  I mean, he wants

10   to make it right.  He wants to go on with his life, and it's

11   just something that happened that we wish we could have nipped

12   it in the bud and seen the signs much earlier.  And I know

13   that I'm -- he hopes for getting it right, and we thank you.

14           THE COURT:  All right.  Thank you.

15           MR. MORRIS:  That's all I have, Your Honor.

16           THE COURT:  All right.

17       Mr. Murrell?

18           MR. MURRELL:  Judge, we will go up to the podium, if

19   that is acceptable to the court.

20           THE COURT:  Surely.

21           MR. MURRELL:  And I do have a couple of people that

22   would like to address the court.

23           THE COURT:  All right.

24           MR. MURRELL:  I would like to begin with Ms. Holly

25   Dodson.  This is Mr. Stetson's fiancée.
```

1          THE COURT:  Ms. Dodson, if you would, start with your

2     full name.

3          MS. DODSON:  Holly Denise Dodson.

4          THE COURT:  All right.

5          MS. DODSON:  Joshua and I met just over a year ago

6     through a mutual friend.  We hit it off immediately.  He was

7     charming and witty and everything I was looking for.

8          At the end of July, 2005, we moved into together, and

9     on December 31st, 2005, we were engaged to be married.

10          Through the past year I have witnessed a remarkable

11     change in Josh.  When we first met, I remember he was reading

12     a motivation book helping through a difficult time in his

13     life.  He was drinking too much and dealing with a lot of

14     emotional turmoil.

15          Over the past year, I've seen him regain control of

16     his life.  He's gotten back into school.  He considerably

17     reduced his alcohol intake.  He even volunteered to help me

18     out to raise money for United Way grilling, by grilling

19     hamburgers and hot dogs we were selling at our car wash.

20          All he really needed was for someone to believe in

21     him, and I do believe in Josh.  He has also made a major

22     impression on my family.  My step-brother was having problems

23     with his mother, a custody battle, and Josh was right there

24     when he needed someone to talk to.  He didn't talk to him

25     about who was right or wrong.  He talked to him about love,

PDF created with pdfFactory trial version www.pdffactory.com

```
1    respect, trust and forgiveness.

2            Josh is an amazingly compassionate person.  He would

3    give everything he has to keep his family safe.  He is finally

4    happy.  He's made peace with the demons that once haunted him.

5    I believe Josh is embarrassed and ashamed that he allowed

6    events beyond his control to leave him vulnerable to such an

7    act as this.  I know in my heart he will never allow such a

8    thing to happen again.

9            We are now planning our life together, and all I see

10   for Josh are great things.  I believe he has potential beyond

11   his wildest dreams, and that he will reach amazing heights, if

12   given the chance.

13           THE COURT:  Thank you.

14           MR. MURRELL:  And his mother, Ms. Stetson, would like

15   to address the court.

16           MS. STETSON:  My name is Jan Stetson.

17           THE COURT:  All right.

18           MS. STETSON:  I'm Joshua's mother.

19           Joshua has always been my very happiest, caring,

20   easygoing child, and he has grown up that way as a man.  This

21   was certainly a shock to me and an aberration in his

22   personality.  This happened, even though I knew that we were

23   all under stress with his father dying, a long -- he had a

24   heart transplant and then cancer.  It was drawn out.  But he

25   was a wonderful man.  Josh had a great relationship with him,
```

PDF created with pdfFactory trial version www.pdffactory.com

1   and he was sort of their lifeline.

2           His father always said that he always worried about

3   Joshua's tender heart, and his -- just his accessibility, you

4   know, to other people, that weren't probably good for him.

5   But during his life, his life was organized to where he didn't

6   hang around anybody like that.  There is always a chance when

7   they grow up and get away that -- I think that in Josh's case,

8   it was brought on by depression.  He was very depressed by his

9   father, because he came home -- he got out of the Marine Corps

10  early, after four years.  They granted him to come home to

11  help me.  His one brother was in law school and, obviously,

12  could not.  And his older brother was working in England with

13  a company and couldn't get off.  Joshua was the one who wanted

14  to, because he was the closest to his father.

15          And Joshua was the one that, when his father would go

16  on business trips, he is the one -- he would say, "I'll take a

17  boy with me," and Joshua is the one that always wanted to go

18  with him and did.

19          I've always felt that, with Joshua, that everybody

20  that met him, they would come up to me and say, "He is just

21  the happiest, brightest boy."  Whenever I would even give him

22  like birthday parties or surprises, although, he had these

23  things a lot, he would always -- it always touched my heart

24  because he was so humble.  He would say, "Oh, for me?  This is

25  for me?" and just grin.  And do you know, that is Joshua's

PDF created with pdfFactory trial version www.pdffactory.com

1    true personality.

2           And now that he has finally -- this thing, this

3    incident has matured him, and I would just pray that God will

4    just lead him into what he has intended for Joshua, and I

5    think Joshua understands that as well.  And I appreciate all

6    of you for working with him in this.  And I do request that he

7    continue in therapy to find out why this happened, for his own

8    sake, to help him lead a better life.  And I appreciate your

9    help and your time.

10          Thank you.

11          THE COURT:  All right.  Thank you.

12          MR. MURRELL:  Thank you, Ms. Stetson.

13          Judge, Mr. Stetson would like to address the court,

14   if he could.

15          THE COURT:  All right.  Mr. Stetson?

16          DEFENDANT STETSON:  If I can have a moment, Your

17   Honor?

18          THE COURT:  Surely.

19          DEFENDANT STETSON:  First off, I would like to say,

20   any of the victims that are present or not, I would like to

21   apologize sincerely to anybody that I had trespassed against.

22   What I did was selfish on my part, and I am highly ashamed of

23   myself.

24          I have not only betrayed my family's trust in myself

25   and everything I was raised to believe in, but I have also

```
 1   betrayed the trust of the community, and that is a very

 2   difficult thing for me.

 3          All I can do is move on from this, pull myself up by

 4   the bootstraps.  Whatever punishment Your Honor thinks is

 5   reasonable, I will accept it and move on from there, move on

 6   with my life and better myself in the eyes of the community,

 7   which I have hurt and tried to become a better citizen in the

 8   community.

 9          I know I will be able to do this, because I have a

10   loving, supportive family and soon-to-be bride who loves me

11   and cares for me, and her family, also.

12          All I request is a fair shake and a second chance,

13   Your Honor.

14          THE COURT:  All right.  Thank you.

15          MR. MURRELL:  Judge, sort my job is to formulate a

16   lot of this into legal terms, and I think there are some legal

17   issues.

18          I have been here before talking to the court about my

19   perception of the role of the guidelines.  It is my position

20   that it is certainly a factor that is important and must be

21   considered.

22          My position is that the guidelines are not

23   necessarily the controlling factor, or that there is any

24   presumption that they should be applied.  I think that there

25   are a series of factors that under 3553 that the court must
```

PDF created with pdfFactory trial version www.pdffactory.com

1    consider; and, again, my position is that the guidelines are

2    one of those factors, and I think that's borne out

3    particularly -- I cited the decision, and it was Judge Tjoflat

4    that gave a concurring opinion, and I think he hit it right on

5    the head, and I think that is the role that he sees that the

6    guidelines play.

7         Under the guidelines you were limited on some of the

8    history and circumstances of the accused that you could

9    consider, at least the extent to which you could consider

10   them.  But 3553, I think, compels the courts to give a broader

11   consideration of both the history and characteristics of the

12   accused or the defendant, as well as the circumstances of the

13   offense.

14        I might start with the circumstances of the offense.

15   We've talked about that a lot already, and it simply is that

16   Mr. Stetson did not play a major role in this.  As I said, I

17   think he became involved in this because it was sort of a

18   perfect storm of adversity.  He was in a difficult financial

19   circumstance.  We have explained that to some extent in the

20   memorandum.  And, again, if you look at the transcript of

21   Mr. Wiggen's testimony, there on page 4, he says, "I found out

22   my friend, Josh, was working at a restaurant.  He was

23   extremely desperate for money."  It's on page 4.  If you go on

24   to page -- let's see -- page 11, Mr. Wiggen is talking about

25   why he thought he could trust Mr. Stetson.  He says,

PDF created with pdfFactory trial version www.pdffactory.com

1   "Mr. Stetson, he's just older.  I was under the impression he

2   would keep his mouth shut.  I knew he wouldn't say no because

3   of his financial situation at the time."

4         So, that was part of this perfect storm of adversity.

5   He was in hard times, financially.  And the other thing is

6   that he was still suffering, I think, from the depression that

7   at least seems to have begun with the difficult death of his

8   father.  You've got Dr. Meyer's report.  And as Mr. Stetson

9   told me at one point, it seemed like he just lacked the

10  ambition and motivation to solve his financial difficulties in

11  a better way.  This just seemed like the easiest thing to do.

12        And I would suggest that, if those two circumstances

13  had not come together, he would never have been involved in

14  this.

15        But that goes to the circumstances of the offense,

16  and I think you can give that greater latitude than you might

17  have been able to prior to the Booker decision.

18        More than that, though, I think you can give weight

19  to his history and his character.  Mr. Stetson is 29 years

20  old.  He has no prior record.  He got to age 29 without being

21  in any trouble.  He served honorably with the United States

22  Marines.  He is halfway through a degree there at the

23  Tallahassee Community College.  I think all of that speaks

24  well of him.

25        I think that, as I said in the memo, though, maybe

```
 1    the most compelling thing is the way he handled his father's
 2    death.  I gave you a couple of quotes there in the footnotes,
 3    and the essence of it is -- I think one of them is,
 4    "Affliction is a man's shining time."  And I think that tells
 5    you a lot about Mr. Stetson's character.
 6          This death of his father was -- you have some letters
 7    that talk about it, but it was really a horrible affair.
 8    There was a heart transplant.  There was cancer.  There was
 9    failed treatments.  And this went on for a long time.
10          Mr. Stetson came home.  He did everything he could
11    for his father.  The money he made he contributed that to the
12    household.  And, again, you have the letters, and I think they
13    detail more than I will today.  But I think that tells you a
14    lot about his character.
15          And that's what we're saying here; that, given his
16    history -- his stint in the Marines; the fact that he's 29 and
17    hasn't been in any trouble before; the fact that he is in
18    school to better himself; and just the way he rose to the
19    occasion in this difficult situation with his father -- tells
20    you that this is not the real Josh Stetson, the fellow that
21    committed this crime.  This was an aberration.
22          Under the guidelines it's pretty hard to get a
23    departure for an aberration -- for an aberrant act.  There are
24    a lot of rules and requirements that make it almost impossible
25    to get.
```

1          But I think that here you have greater latitude, and

2     if you take that into account, take his character into

3     account, you will see that this was truly an unusual event;

4     that he is not someone who is going to come back before the

5     court, and that he has a successful life in front of him.

6          So, the standard here is for the court to impose a

7     sentence that is adequate but not greater than necessary to

8     fulfill the goals of the Sentencing Reform Act, and that's

9     what I'm saying to the court.  In this case, I don't think

10    it's -- a sentence that perhaps has some home detention but

11    does not have any incarceration is sufficient.  I might point

12    out, too, in that range as he falls, the court is not

13    obligated to impose it.  He's in Category C, I believe it is,

14    and the court has some options there, as far as reducing the

15    amount of incarceration and substituting a period of home

16    detention.  But, again, our request is that the court fashion

17    a sentence that would allow him to continue in school and to

18    continue his life as it is and not impose any imprisonment.

19         I think you have a couple of recommendations; that

20    you should impose conditions of counseling, probably some --

21    to include some substance abuse as well.  You've got some

22    letters, I think, that hit that right on the head.

23         So, again, Mr. Stetson, as you can see, I think,

24    truly regrets this offense, and I think he has the sort of

25    character that would allow the court to impose a sentence that

1    does not include any incarceration.

2              THE COURT:  All right.  Thank you.

3              Ms. NeSmith?

4              MS. NeSMITH:  Thank you, Your Honor.

5              The government believes that there is a presumption

6    in favor of the guidelines, and we also recognize the

7    significance of the factors set out in 3553(a).  We point out

8    the fact that this was not a case where there was a one-time

9    incident.  This happened over a period of time involving at

10   least 16 cards that we know about.  This was a well

11   thought-out plan, which both of the defendants participated

12   in, both of them played their essential roles, and it was a

13   very calculated plan.

14             If you think about it, Mr. Wiggen was persistent in

15   carrying out his plan.  Once one thing didn't work, then he

16   tried something else.  And, finally, until he recruited

17   Mr. Stetson, then Mr. Stetson then got involved.  But both of

18   them played important roles in carrying out this plan.

19             The government feels, though, any emotional or mental

20   issue for either Mr. Wiggen or Mr. Stetson do not mitigate

21   their culpability.  And I would elaborate on this in the

22   government's sentencing memorandum.

23             We feel as though, although the financial and

24   emotional or mental distress experienced by either of the

25   defendants may very well have happened, that did not change

PDF created with pdfFactory trial version www.pdffactory.com

1    the fact that both of them intended and knowingly participated

2    in this scheme.

3            There are a lot of people, a lot of defendants who

4    have the same sort of distress, financial, emotional or

5    mental; however, that does not justify their criminal conduct.

6            It appears just from today that both Mr. Wiggen and

7    Mr. Stetson have strong family and friend support, which

8    didn't just happen today, but which existed at the time that

9    this fraud happened.  And there is just no reason, no excuse

10   which justifies their conduct.

11           Furthermore, there is no evidence that Mr. Bojan had

12   any extraordinary influence over Mr. Wiggen or somehow made

13   him get involved in this type of scheme.  It appears that

14   Mr. Bojan simply afforded Mr. Wiggen an opportunity to which

15   Mr. Wiggen took full advantage of.

16           In conclusion, it is the government's position that

17   this case is in the heartland of fraud case, as again

18   emphasized in the government's sentencing memorandum.  And

19   with that, we again oppose any downward departure for either

20   defendant, and we ask for a sentence in the mid-range of the

21   guidelines.  We feel as though a sentence in the mid-range of

22   the guidelines is appropriate.  Such a sentence would reflect

23   the seriousness of the offense, as well as recognize --

24   affording the deterrent effect as well as promote respect for

25   the law and provide adequate and just punishment for both

PDF created with pdfFactory trial version www.pdffactory.com

1   defendants.

2          Thank you.

3          THE COURT:  Any rebuttal?

4          MR. MORRIS:  No, sir.

5          MR. MURRELL:  I have just a couple of words.

6          Ms. NeSmith used that phrase, "heartland," that this

7   is in the heartland of cases.  Well, of course, that's the

8   analysis for whether or not you should depart from the

9   sentencing guidelines.  I don't think that analysis answers

10  the question of whether or not this case, under Booker,

11  justifies a lesser sentence.  To me that is a different

12  analysis altogether.

13         The fact that there are other defendants with mental

14  illnesses, well, that's fine.  But I think now the court can

15  consider those things.  That's all a part of the history and

16  characteristics of the defendant.

17         The fact that this was not a one-time single

18  transaction, that there were a number of credit cards swiped

19  by Mr. Stetson, well, here again, that's the analysis that

20  falls under the guidelines and whether or not you can consider

21  this as aberrant conduct.  It's not the analysis that applies

22  to Booker.

23         So, again, I did ask for a downward departure, and I

24  still ask for that, but it seems to me that request is sort of

25  subsumed by my argument that under Booker there is a

PDF created with pdfFactory trial version www.pdffactory.com

 1   justification for a lesser sentence.  So, again, it seems to

 2   me the test is not whether it's out of the heartland or not.

 3   The test is whether or not the penalty is sufficient but not

 4   more than necessary to fulfill the goals of the Sentencing

 5   Reform Act.

 6           THE COURT:  All right.  Let me tell you the sentence

 7   I'm going to impose, and then I'll explain it, and then I'll

 8   formally impose it.

 9           In Mr. Wiggen's case, I'm going to impose a sentence

10   of 21 months in custody.  That's the midpoint of the

11   guidelines range.

12           In Mr. Stetson's case, I'm going to impose a sentence

13   of five months in the Bureau of Prisons and five months of

14   home detention.  That's the low end of the guidelines range,

15   and it's a split sentence between prison and home detention as

16   authorized by the guidelines.

17           Both of those are guideline sentences.

18           Now, to explain them let me start by saying that

19   Mr. Murrell is correct in the last comments, that the fact

20   that the case is in the heartland doesn't necessarily mean

21   that the sentence should be within the guidelines.  It would

22   have meant that before Booker, but it doesn't anymore

23   necessarily mean the sentence should be within the guidelines.

24   It's also true that the number of instances involved doesn't

25   necessarily mean that the sentence should be within the

PDF created with pdfFactory trial version www.pdffactory.com

1    guideline.  But both of those things are factors that are

2    relevant to the 3553 analysis.

3         The sentence in any case takes into account the

4    offense and also the offender -- what was done and also the

5    circumstances, the background, the attitude of the particular

6    defendant.

7         In this case, it is correct that each defendant has

8    some mitigating circumstances relating to mental-health.

9    Different circumstances for each defendant, but they each have

10   circumstances that mitigate toward a lesser sentence.

11   In fact, it is clear to me that I could depart, at least in

12   Mr. Wiggen's case under Section 5K2.13 of the guidelines, and

13   I assume for purposes for sentencing that I also could depart

14   under these circumstances in Mr. Stetson's case.  Of course,

15   that provision of the guidelines indicate that a departure may

16   be warranted based upon a defendant's mental-health, mental

17   capacity.  The guideline also says that, if a departure is

18   warranted, the extent of the departure should reflect the

19   extent to which the reduced mental capacity contributed to the

20   commission of the offense.

21        In this case the mental circumstances of each

22   defendant may have contributed to the offense, but probably

23   not as greatly as has been suggested.  I am going to include

24   in a judgment a recommendation to the Bureau of Prisons that

25   Mr. Wiggen be evaluated and get appropriate treatment, the

PDF created with pdfFactory trial version www.pdffactory.com

1  same for Mr. Stetson, and they should get treatment during

2  their period of supervision after release from custody.  But

3  certainly a substantial factor in this offense for each

4  defendant was monetary, which is as typical an explanation of

5  any offense, particularly a financial offense, as there is.

6       Mr. Stetson apparently was in dire financial

7  circumstances, but many people are in dire financial

8  circumstances.  He didn't deal with the stress and the

9  difficult circumstances very well, and his mental

10  circumstances contribute to that.  But that's -- that's also a

11  situation that is suffered by people who are of good

12  mental-health.  It is difficult to deal with hard

13  circumstances.  I don't make light of it.  I just think that,

14  under all of the circumstances, I ought not impose a sentence

15  in the case below the low end of the guidelines range.

16       I do think that those circumstances call for a

17  low-end sentence in this case.  In Mr. Wiggen's case, the

18  mental-health issues are a little more substantial.  They

19  probably cut toward the low end even a little more strongly.

20  His involvement in this offense is, of course, much greater.

21  And under all of the circumstances, I think that the

22  mitigating circumstances and aggravating circumstances about

23  offset, and that the appropriate sentence is the middle.  I

24  will say this:

25       Had it not been for the mental-health circumstances,

PDF created with pdfFactory trial version www.pdffactory.com

1   I'm not at all certain that the sentence in this case wouldn't

2   have been at the high end for each defendant.  Maybe not so

3   much for Mr. Stetson.  He did have a minor role in this

4   offense.  But in Mr. Wiggen's case, if you stand back and look

5   at the offense rather than looking at the offender, and you

6   say this is somebody that took the lead in this kind of a

7   scheme, I'm not sure if you ask people at large whether 24

8   months is an appropriate sentence, you wouldn't get a response

9   that perhaps that's certainly not excessive.

10          I don't think one should make light of this offense.

11  Not just the impact on the overall economic system, we do have

12  an economic system that relies on people being able to take

13  cards and make payments, and this kind of an offense is a

14  significant threat to that system, but aside from that, not

15  looking at the more universal aspect of the impact on the

16  economy but looking at the individuals, this is the kind of

17  offense that can have a very devastating effect on

18  individuals.  There is no indication here that any of these

19  people suffered long-term effects on their credit, but

20  certainly others have from similar kinds of offenses.  This is

21  a type of offense that is serious.

22          It's also the type of offense where the deterrent

23  rationale of the criminal justice system probably has a place.

24  If I could control the message that went out of the courtroom,

25  I'd rather the newspaper say tomorrow that these people got

PDF created with pdfFactory trial version www.pdffactory.com

1    20 years in prison.  I don't think that's what they ought to

2    get, because I don't think that's the appropriate sentence.

3    But in a way it would be nice if the message got out to young

4    men who might do this, or young women that might do this, that

5    it is a serious crime and there are serious consequences.

6            So, I have looked at these individuals, and I really

7    put very far in the background the question of deterrence and

8    effect on the economic system, even the effect on these

9    particular victims.  I have looked more at these individuals

10   and what's appropriate just for these individuals.

11           But I did think it appropriate to note, as we

12   discussed this, that it's a serious offense.  And that in the

13   next case, where the circumstances of individuals are

14   different, a defendant probably ought not expect a low-end

15   sentence or even a midpoint sentence necessarily for the same

16   conduct.

17           So, the offense would have led to a higher sentence.

18   Because of the circumstances of the offenders, this is the

19   sentence that I think is appropriate.

20           Mr. Stetson and Mr. Wiggen, if you would, please,

21   stand for the formal imposition of sentence.

22           I find that the presentence reports are accurate

23   together with the additional findings I've made on the record

24   here today.

25           Pursuant to the Sentencing Reform Act of 1984, as

PDF created with pdfFactory trial version www.pdffactory.com

1  amended, it is the judgment of the court that the defendant,

2  William Joshua Boyd Stetson, is committed to the custody of

3  the Bureau of Prisons to be imprisoned for a term of five

4  months; and that the defendant, Craig Robert Wiggen, Jr., is

5  committed to the custody of the Bureau of Prisons to be

6  imprisoned for a term of 21 months.

7          Upon release from imprisonment, each defendant will

8  be on supervised release for a period of three years.

9  Supervision will be under the standard conditions of

10  supervision that have been adopted by this court and the

11  following special conditions:

12          The defendant shall report in person to the probation

13  office in the district to which he is released within 72 hours

14  of release from the custody of the Bureau of Prisons.

15          The defendant shall not own or possess a firearm,

16  dangerous weapon, or destructive device.

17          The defendant shall submit to testing to determine

18  whether he's using drugs or alcohol.

19          The defendant shall participate in a program of

20  substance abuse treatment.

21          The defendant shall participate in a program of

22  mental-health treatment.

23          The defendant shall provide the probation officer all

24  requested financial information -- business or personal.

25          The defendant shall make payments toward any unpaid

PDF created with pdfFactory trial version www.pdffactory.com

1    restitution balance in an amount that we'll discuss in just a

2    moment.

3         And in Mr. Stetson's case, the defendant shall serve

4    a period of five months' home detention with electronic

5    monitoring to begin at a time designated by the probation

6    officer.  While on home detention, Mr. Stetson shall be in his

7    place of residence except for absences approved by the

8    probation officer for gainful employment, community service,

9    religious service, medical care, education or training, or

10   other such purposes as may be authorized by the probation

11   officer.

12        Now, we need -- and I'm going to come back to some

13   financial aspects of this in just a moment.

14        The outstanding restitution amount is calculated in

15   the presentence report as $5,487.90.  Does anyone disagree

16   with the assertion that that's the appropriate amount of

17   restitution?

18        MR. MURRELL:  Not Mr. Stetson.

19        MR. MORRIS:  No, sir.

20        MS. NeSMITH:  No, Your Honor.

21        THE COURT:  Each defendant is ordered to pay a

22   special monetary assessment of $100 per count, for a total of

23   $200 as required by statute.

24        At the time of the presentence report, I did not have

25   a financial statement -- no financial statement had been

PDF created with pdfFactory trial version www.pdffactory.com

1    provided for Mr. Wiggen.  Is that still the case?

2              PROBATION OFFICER WILSON:  Yes, Your Honor.

3              THE COURT:  In Mr. Stetson's case, my conclusion,

4    based on the information in the presentence report, is that he

5    does not have the financial ability to pay a fine over and

6    above the restitution amount.  No fine is imposed.

7              Now, in Mr. Wiggen's case, I need to know whether he

8    has additional assets.  I guess I should ask you first,

9    Mr. Morris, you are retained in the case.

10             MR. MORRIS:  I am, Judge.

11             THE COURT:  I can take his testimony about his

12   financial situation.  But, frankly, I ordinarily don't waive a

13   fine without having a statement provided showing what assets

14   he has.  The fact that he retained you doesn't bear on that,

15   because the family may have paid you.  He may not have.  But

16   if he's got assets, I need to know it.

17             MR. MURRELL:  Judge, if Your Honor would not mind a

18   brief inquiry, I think that it would be sufficient.  He is

19   able to answer --

20             THE COURT:  All right.  First, let me start by

21   telling you --

22             Mr. Stetson and Mr. Murrell, you may be seated.

23             Mr. Wiggen, if you would stand up for me -- remain

24   standing for me for just a minute.

25             You're still under oath.  Let me ask you this:

PDF created with pdfFactory trial version www.pdffactory.com

1          Tell me what property you own -- bank accounts,

2  stocks and bonds, real property, cars.  Tell me everything you

3  own.

4          DEFENDANT WIGGEN:  A '97 Mitsubishi Eclipse.

5          THE COURT:  Anything else?

6          DEFENDANT WIGGEN:  No.

7          THE COURT:  Okay.  Based on that testimony, my

8  finding is that Mr. Wiggen doesn't have the financial ability

9  to pay a fine above the -- beyond the restitution amount, and

10 so no fine is imposed.

11         I'm inclined to set a monthly restitution amount of

12 $155.  Does either defendant think that you would not be able

13 to make a restitution amount of $155?

14         Mr. Murrell?

15         MR. MURRELL:  That seems reasonable, $155 a month;

16 yes, sir.

17         MR. MORRIS:  That would be fine, Your Honor.

18         THE COURT:  All right.  And I chose that because, if

19 I did the math right, $155 will amortize the $5487 over the

20 course of the three years.

21         It is a condition of each defendant's supervision

22 that the defendant make payments toward any unpaid restitution

23 balance in the amount of at least $155 per month, or any

24 adjusted amount set by further court order based on the

25 defendant's ability to pay from time to time.  The restitution

PDF created with pdfFactory trial version www.pdffactory.com

1   or payments are to commence within 60 days following the

2   defendant's release from custody.  And, actually, with the 60

3   days, you probably fall just short of the $5487, but --

4          PROBATION OFFICER WILSON:  Your Honor, doing the math

5   really quickly, that doesn't take into consideration that

6   there are two defendants, joint and several.

7          THE COURT:  Ah, perfect.

8          PROBATION OFFICER WILSON:  I believe it would be

9   about $80.

10         THE COURT:  Well, it needs to be as much as they are

11  able to pay.  They've told me they can pay 155.  We'll set it

12  that way and get through it early, and that's fine.  And, for

13  that matter, if you pay the restitution and have complied

14  fully, there's nothing that says you have to remain on

15  supervision for the full three years.  The reason the

16  three-year period has been set is primarily to assure that the

17  restitution gets paid, and that you -- and that the defendant

18  fully complies, of course.

19         The total sentence, therefore, in Mr. Wiggen's case

20  is 21 months in custody; in Mr. Stetson's case it's five

21  months in custody and five months of home decision.  Each

22  defendant has three years of supervised release, a $200

23  special monetary assessment, and restitution of $5,487.90.

24         Are there any objections to the sentence as imposed

25  other than the objections already specifically set forth on

PDF created with pdfFactory trial version www.pdffactory.com

1  the record of this hearing, which I summarized with respect to

2  the guidelines and also include the defense objections based

3  on Booker and Section 3553?  Any other objections?

4        MR. MORRIS:  Not from Mr. Wiggen, Judge.

5        MR. MURRELL:  I just wanted to sort of hone in on my

6  objection to the loss calculation.  For most of these cards,

7  you arrived at a figure that, in the court's view, represents

8  what Mr. Wiggen intended to charge on the card, and I think

9  that may well be true when he first got the information, he

10  may have intended to do that, but some time between that point

11  in time and the time he discovered that he was being

12  investigated, he decided not to do that.  And so it's my

13  position, in those circumstances, where maybe he intended one

14  thing but over the course of time before he was arrested or

15  before he discovered he was subject of an investigation, he

16  decided not to follow through with that original plan, that

17  the actual value should be used, which in most of these

18  cards -- in the case of most of these cards would be zero.

19  So, that's the nature of my objection; that when the court --

20        THE COURT:  I think I understood.  I don't disagree

21  with the legal proposition that is included within that

22  argument.  I'm not persuaded on the facts that this was a

23  voluntary decision to stop prior to the time when the heat was

24  on.

25        So, I don't disagree with your legal proposition.  I

PDF created with pdfFactory trial version www.pdffactory.com

1    disagree with the factual assertion.  There's no way of

2    knowing for certain.  I do the best I can resolving the facts.

3    But I think, under the circumstances, I can't make a finding

4    that Mr. Wiggen decided to quit before the heat was on.  It's

5    not a clear-cut factual issue.  I understand your argument

6    that he told so much and was so candid, that I should credit

7    everything he said, and there is some force to that.  On the

8    other hand, it's a defendant who told the officers and told us

9    here in court that he intended to continue illegal conduct.

10   He was going to go get the plasma TV.  He was going to get

11   maybe a digital camera.

12           It would be odd for somebody to continue the criminal

13   conduct but abandon the other cards.  Not impossible.  It's

14   not conclusive either way.  But the best I can do is to say,

15   my finding is what it is about the intended loss.  I don't

16   find that he abandoned that intent.

17           I do think, if he initially intended that loss and

18   then changed his mind before the heat was on and decided not

19   to go further, that the original intent would not control, the

20   later intent would.  I think you have it right on the law.  I

21   do understand that issue is fully preserved, and so thank you.

22           Any other objections?

23           MR. MURRELL:  No objections.  I would ask that the

24   court recommend that Mr. Stetson be allowed to serve his

25   sentence as close to Tallahassee as possible.

1          THE COURT:  I will do that.  And is the location the

2    same for Mr. Wiggen, or is it --

3          MR. MURRELL:  It is not.  Daytona, Ormond Beach.

4          THE COURT:  I will include those recommendations

5    about the location.  I should say to each of you that the

6    Bureau of Prisons takes into account a great number of factors

7    in deciding where to designate someone.  My recommendation is

8    one factor, but it's only one factor.  So, they may or may not

9    do it.

10         I will also include in the judgment a recommendation

11   for each defendant that the defendant receive residential drug

12   abuse treatment.  In Mr. Stetson's case, it won't be

13   residential.  It will just be drug abuse treatment, substance

14   abuse treatment.  In Mr. Wiggen's case, the recommendation

15   will be the residential program.

16         I also include a recommendation to the Bureau with

17   respect to each defendant that the defendant receive a

18   mental-health evaluation and treatment as may be appropriate.

19         The sentences are concurrent on each of the counts.

20         PROBATION OFFICER WILSON:  Would it be possible to

21   note who is to pay for the electronic monitoring as to

22   Mr. Stetson?

23         THE COURT:  That's the other financial matter I

24   needed to address.  Thank you.

25         In view of the restitution obligation, I will not

1    require Mr. Stetson to pay the cost of home detention.

2            What else?

3            MS. NeSMITH:  Your Honor, there is a criminal

4    forfeiture count.  I believe the only thing would be the

5    computer that was turned over by Mr. Wiggen.  I believe the

6    police department still has that.

7            THE COURT:  Mr. Morris, is there any reason why the

8    judgment should not include a requirement that Mr. Wiggen

9    forfeit the computer?

10           MR. MORRIS:  No, sir.

11           THE COURT:  All right.  As part of the judgment,

12   Mr. Wiggen will be ordered to forfeit any interest he has in

13   the computer that was seized.

14           MS. NeSMITH:  I'm told also, Your Honor, there is a

15   skimmer and the KeyKatcher as well that is in the possession

16   of the Secret Service.

17           MR. MORRIS:  Same position, Your Honor.

18           THE COURT:  All right.  The forfeiture will extend to

19   the skimmer and KeyKatcher.

20           MR. MORRIS:  Your Honor, I think I likely know the

21   answer to this question, but Mr. Wiggen had inquired as to

22   whether Your Honor is capable of recommending that he be

23   housed in minimum security or things of that nature.

24           THE COURT:  I don't do that because I don't keep up

25   with the provisions.  Frankly, it seems to me overwhelmingly

1    likely that that would be the case here.  But I try to keep up

2    with the details of the sentence guidelines.  I don't try to

3    keep up with the details of the classification system.

4          And in Mr. Wiggen's case, it may be, for example,

5    that he will go to a facility with better mental-health

6    capabilities, and that may well be the best thing for

7    Mr. Wiggen.  The medical facilities, I'm not sure are even

8    classified in the same way.  But the best I can do is

9    recommend the appropriate treatment and the nearest location,

10   and the Bureau will take it from there.

11         Each defendant has been on release.  Mr. Stetson is

12   in school?

13         MR. MURRELL:  Yes, sir.

14         THE COURT:  And finishes April 28th, is that what it

15   said, or something like that?

16         MR. MURRELL:  Judge, he feels like he should go ahead

17   and start his sentence, but he would ask the court to allow

18   him to self-surrender.  Thirty days I think would be enough

19   time.

20         THE COURT:  Well, you can surrender early.  Let me

21   tell you what I ordinarily do, and that's give 60 days.  The

22   reason I do that is because it generally takes the Bureau of

23   Prisons some part of that, and often up to the end of that, to

24   designate a facility.  So, when people are going to

25   self-surrender, I usually give 60 days.  That would take you

PDF created with pdfFactory trial version www.pdffactory.com

```
 1    out beyond the end of the semester.  And if you are part of

 2    the way through and paid taking classes this far, it would be

 3    just as well to finish and get the credit, so -- I can do

 4    that.

 5            In Mr. Stetson's case, he's been in compliance?

 6            PROBATION OFFICER WILSON:  Yes, sir, he has been in

 7    compliance.

 8            MS. NeSMITH:  No objection.

 9            THE COURT:  All right.  And same with respect to

10    Mr. Wiggen?

11            MS. NeSMITH:  Actually, Your Honor, with Mr. Wiggen,

12    due to his involvement in this case, we would oppose a

13    self-surrender.

14            THE COURT:  Mr. Morris, your request is to

15    self-surrender?

16            MR. MORRIS:  Yes, sir, it is, Your Honor.

17            THE COURT:  Ms. Wilson?

18            PROBATION OFFICER WILSON:  I believe, Your Honor, we

19    have submitted a violation petition on behalf of the -- not on

20    behalf -- regarding Mr. Wiggen.  Our concern is the

21    defendant's personal safety, as well as the fact that his

22    attempted suicidal overture or suicide attempt was conducted

23    with prescription medication not prescribed to him, so --

24            THE COURT:  I don't know if Mr. Morris knew that

25    there was even anything afoot.  There was a petition.
```

PDF created with pdfFactory trial version www.pdffactory.com

1  Mr. McKinley is here, the probation officer, had brought this

2  to my attention, and so I evaluated whether we should have had

3  Mr. Wiggen arrested down at, I guess, Daytona Beach in the

4  last week or two.  And one never knows, but the call that I

5  made was that he would show up, and he seemed to have gotten

6  treatment and was back on track, and he would come here, and

7  that would certainly be better than having the marshals arrest

8  him down there and bring him up.

9          That's my concern now.  Mr. Morris, is -- I mean,

10  aside from mental-health considerations, I would allow him to

11  self-surrender in a couple of months.  But he needs to get the

12  best treatment as soon as he can.  His family is here.  I

13  don't know how well he's --

14          MR. MORRIS:  He's currently -- while he was in

15  Daytona, he had inpatient treatment for five days, wound up

16  being released under Dr. Greer's care.  There is a little bit

17  of an alteration in the regimen of medication.  He's residing

18  with his parents.  He's currently attending treatment as

19  required by Dr. Greer.  Things seem to be relatively stable.

20          In the large picture of things, I don't foresee a

21  circumstance where this would be problematic.  Of course, I

22  don't have a crystal ball, but I think that -- I do not -- I

23  think the best evidence is Mr. Wiggen being here today, of

24  course.

25          THE COURT:  Mr. Wiggen, Sr., can you get him to, if

1   he is required to get to a facility in two months, it may be

2   Miami, it may be --

3          MR. WIGGEN:  Yes, I can, and I'll take full

4   responsibility.  I do think, for his mental state, he is

5   seeing a doctor and things are getting much better.  I'm

6   afraid that, if he was taken into custody now, that that could

7   be, you know, be a bad thing for his mental health.

8          THE COURT:  All right.  I'm going to leave Mr. Wiggen

9   on release and here's why:

10          One never knows what the right decision is in a

11   situation.  There is no indication that Mr. Wiggen is a danger

12   to the community or to others.  He has in the recent past been

13   a danger to himself.  If there is an indication that he is a

14   danger to himself, then we can have him arrested and deal with

15   it.

16          What I would like to have happen is Mr. Wiggen to get

17   the best care he can get, and it seems to me that the

18   overwhelming likelihood is that the better way to deal with it

19   is to let Dr. Greer treat him, and then have some transition.

20   And, of course, the practical difficulty in the Marshals

21   Service and the Bureau of Prisons is, if he is taken into

22   custody -- and the marshals were here to do it, they just

23   walked out the door when I said I was going to leave him

24   out -- but if they take him into custody, he would be in

25   custody in Tallahassee at the FDC tonight, probably, and then

1    he would start being transported.  And, of course, they don't

2    transport people just one at a time.  So, it takes a little

3    while.  And then he would get to a facility.

4         But in the meanwhile, it's hard to get the medicines

5    right.  It's hard to get the treatment right.  And in a

6    critical mental-health situation, that may not be -- that

7    wouldn't be the best.

8         So, Mr. Wiggen, comply with all of your conditions of

9    release.  If you find yourself in a difficult situation

10   mentally, needing care, that's what Dr. Greer is for.  You

11   have a very supportive family.  They are up here today.  Talk

12   to them.  Talk to Dr. Greer.  Do what you need to do to cope.

13   You can do this.  The sentence that you are facing is not

14   pleasant, but you will get through this, and you can be fine

15   when you are finished.

16        I would say to both of you, comply with the

17   conditions of your release.  You are still subject to the same

18   conditions you've been subject to.  One of those conditions is

19   that you surrender for service of any sentence.  In addition,

20   it would be a separate federal crime to fail to report for

21   service of your sentence.  So, make sure that you do that.

22   And then when you get out, and you are on supervision, make

23   sure you comply with all of those conditions.

24        Mr. Stetson, in your case one of those is home

25   detention.  So, for five months, you are basically going to be

PDF created with pdfFactory trial version www.pdffactory.com

```
 1    in prison, only you will be at home.  That's much better for

 2    you than being in prison, but it's meant to be like being

 3    prison.  You can't leave.  You can't -- except for the things

 4    I've told you about, if you have any doubt, talk to your

 5    probation officer.

 6           Each of you has the right to appeal.  Any appeal

 7    needs to be filed within ten days.  If you are unable to

 8    afford a lawyer for an appeal, then a lawyer would be

 9    appointed for you.  The clerk of the court would file a notice

10    for you, if you want the clerk to do that.  Just make sure

11    that, if you wish to appeal, a notice of appeal gets filed

12    within the next ten days.

13           You should talk with your lawyer right now today to

14    make sure that your lawyer has a clear understanding of

15    whether you do or do not wish to appeal in the case.  You

16    ought to take into account your lawyer's advice, but the

17    decision is yours whether to appeal or not.  So, if the lawyer

18    says there is no point in appealing, and you want to appeal,

19    the lawyer will do it.

20           Mr. Wiggen, in your case you should also talk with

21    Mr. Morris about what his involvement will be, if any, in any

22    appeal.

23           And for the lawyers, let me say, I have been asking

24    that you write a letter to confirm if the defendant choses not

25    to appeal -- and that may not be; you both have got issues in
```

1   this case that you can appeal, so that may not come up, but --

2   I have been asking defense lawyers, if the defendant decides

3   not to appeal, please, write a letter to the defendant to

4   confirm that.  For two reasons, one, it confirms to the

5   defendant the importance of the decision he's made.  Second,

6   it provides a clear record.  We have had several instances

7   lately where lawyers wound up coming back over here to testify

8   two years later about what the conversation was about whether

9   to appeal.  It's just better for everybody to make sure that

10  there is a very clear understanding.

11          What else, if anything, that we need to do in this

12  matter this afternoon?

13          Ms. Wilson?

14          PROBATION OFFICER WILSON:  Would it be possible to

15  get a bond modification on Mr. Wiggen, such that he could

16  reside in the Middle District of Florida, have travel

17  restricted to the Middle District of Florida?  Currently, he

18  is restricted to the Northern District of Florida.

19          THE COURT:  Certainly.  I'll restrict him to the

20  Northern and Middle Districts, then, if there is any need to

21  go back and forth between the probation office.  So, I will

22  modify it to say that he's not to go outside the Northern or

23  Middle Districts of Florida, without the approval of the

24  probation officer.

25          PROBATION OFFICER WILSON:  And, also, was there a

PDF created with pdfFactory trial version www.pdffactory.com

1    specific surrender date?

2         THE COURT:  Oh, indeed there needs to be.  Thank you.

3         Two months is May the 8th.  2:00 p.m. on May the 8th,

4    2006.  Thank you.

5         Anything else?

6         MR. MORRIS:  No, sir.

7         THE COURT:  Thank you all.  We'll be in recess.

8       (The proceedings adjourned at 4:02 p.m.)

9                    *  *  *  *  *  *  *  *  *

10

11

12

13   I certify that the foregoing is a correct transcript from the
     record of proceedings in the above-entitled matter.  Any
14   redaction of personal data identifiers pursuant to the
     Judicial Conference Policy on Privacy are noted within the
15   transcript.

16

17

18   _____        _____

     Judy A. Gagnon, RPR                             Date
19   Official U.S. Court Reporter

20

21

22

23

24

25

```
 1                          INDEX

 2

 3    WITNESS FOR THE GOVERNMENT:                      PAGE

 4

        TAMRA ANN THOMPSON
 5          DIRECT EXAMINATION BY MS. NeSMITH          5
            CROSS-EXAMINATION BY MR. MORRIS            20
 6          CROSS-EXAMINATION BY MR. MURRELL           24
            REDIRECT EXAMINATION BY MS. NeSMITH        27
 7

 8                  *   *   *   *   *   *   *   *

 9

10    WITNESS FOR THE DEFENDANT WIGGEN:                PAGE

11
        CRAIG ROBERT WIGGEN, JR.
12          DIRECT EXAMINATION BY MR. MORRIS           28
            CROSS-EXAMINATION BY MR. MURRELL           35
            CROSS-EXAMINATION BY MS. NeSMITH           37
13          REDIRECT EXAMINATION BY MR. MORRIS         42

14
                    *   *   *   *   *   *   *   *
15
                      GOVERNMENT'S EXHIBITS
16

17
      NO.:     DESCRIPTION                             PAGE
18
        A  Listing of credit-card information          14
19      B  Transcript of Defendant Wiggen's police interview  15

20                  *   *   *   *   *   *   *   *

21

22

23

24

25
```

1                    DEFENDANT STETSON EXHIBITS

2

    NO.:    DESCRIPTION                                        PAGE
3
     1  Dr. Meyer's CV                                          47
4    2  Dr. Meyer's report - to be maintained under seal        47
     3  Letters                                                 47
5    4  Report from Maryanne Etheridge, counselor               47

6

                    DEFENDANT WIGGEN EXHIBIT
7

8    A  Report of Dr. Richard Greer                             45

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

PDF created with pdfFactory trial version www.pdffactory.com